# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

IAN MOBLEY, KIMBERLY MOBLEY,
PAUL KAISER, ANGIE WONG,
JAMES WASHINGTON, NATHANIEL PRICE,
JEROME PRICE, STEPHANIE HOLLANDER,
JASON LEVERETTE-SAUNDERS,
WANDA LEVERETTE, DARLENE
HELLENBERG, THOMAS MAHLER, and          Hon.
LAURA MAHLER,
                                        Case No.
                 Plaintiffs,

vs.

                                        JURY TRIAL DEMANDED

CITY OF DETROIT, a municipal corporation,
Lieutenant VICKI YOST, a Detroit police
officer, in her individual capacity, Sergeant
DANIEL BUGLO, a Detroit police officer, in his
individual capacity, and UNNAMED DETROIT
POLICE OFFICERS, in their individual
capacities,

                 Defendants.

_____/

Daniel S. Korobkin (P72842)            William H. Goodman (P14173)
Michael J. Steinberg (P48085)          Julie H. Hurwitz (P34720)
Kary L. Moss (P49759)                  Kathryn Bruner James (P71374)
American Civil Liberties Union         Cooperating Attorneys, American Civil
  Fund of Michigan                       Liberties Union Fund of Michigan
2966 Woodward Ave.                     Goodman & Hurwitz, P.C.
Detroit, MI 48201                      1394 E. Jefferson Ave.
(313) 578-6824                         Detroit, MI 48207
dkorobkin@aclumich.org                 (313) 567-6170
msteinberg@aclumich.org                bgoodman@goodmanhurwitz.com
                                       jhurwitz@goodmanhurwitz.com
                                       kjames@goodmanhurwitz.com
Attorneys for Plaintiffs

                                       Attorneys for Plaintiffs

_____/

## **COMPLAINT**

This is a federal civil rights lawsuit challenging the unlawful and warrantless search and seizure of innocent persons and their property by the Detroit Police Department and its officers in violation of the Fourth and Fourteenth Amendments to the United States Constitution as enforceable through 42 U.S.C. § 1983.  Plaintiffs seek relief in the form of damages, an injunction, and a declaratory judgment.  They complain as follows:

## INTRODUCTORY STATEMENT

1.      This civil action arises from a Detroit Police Department raid on a late-night dance and music event at the Contemporary Art Institute of Detroit ("CAID") on May 31, 2008.

2.      That night, the CAID was hosting its popular monthly members-only event known as "Funk Night," which featured a dance floor and a disc jockey.  Approximately 130 patrons were in attendance.  They were singing, dancing, listening to music, talking with friends, and otherwise engaged in completely innocent activity.  By all appearances, they were attending a lawful and legitimate social event on a typical Friday night in the City of Detroit.

3.      Just after 2:00 a.m., and without warning, dozens of police officers from the Detroit Police Department's "vice squad" rushed into the CAID and ordered everyone there to lie face-down on the ground.  These officers, despite having no reason to suspect anyone at Funk Night would be armed or dangerous, stormed the CAID clad in paramilitary commando-style gear: they were wearing dark masks, dressed entirely in black, and had flashlights mounted on shotguns.  The officers shoved, kicked, and hit some of the CAID's bewildered and terrified patrons.

4.      Everyone at the CAID that night was detained for several hours for no apparent reason.  A warrantless search of everyone present uncovered no illegal drugs or weapons.  Nonetheless, all 130 patrons were cited for allegedly violating a Detroit ordinance, City Code § 38-5-1, that makes it a crime to "loiter in a place of illegal occupation."

2

5.     The CAID allegedly lacked a proper license to host Funk Night.  The police, however,  had no reason to suspect that the CAID's *patrons* knew that Funk Night was not properly licensed or that the CAID was in any other way an allegedly unlawful operation.  All 130 innocent CAID patrons were nonetheless detained, searched, and charged with a crime merely for being present.  They were then forced to defend against these frivolous criminal charges in state court.

6.     The police also impounded the cars of 40 innocent patrons who had driven to or near the CAID.  Although these cars were legally parked and had not been used for any illegal activity, they were seized under Michigan's "nuisance abatement" statute, M.C.L. § 600.3801.  Some patrons had to pay nearly $1,000 to get their cars back.  Others never saw their cars again.

## JURISDICTION AND VENUE

7.     Jurisdiction is proper under 28 U.S.C. §§ 1331 and 1343 because this is a civil action seeking redress for the deprivation of rights secured by the United States Constitution.

8.     Venue is proper under 28 U.S.C. § 1391(b)(2) because the events giving rise to the claims asserted occurred in Wayne County, which is within the Eastern District of Michigan.

## PARTIES

9.     Plaintiffs Ian Mobley, Paul Kaiser, Angie Wong, James Washington, Nathaniel Price, Stephanie Hollander, Jason Leverette-Saunders, Darlene Hellenberg, and Thomas Mahler (collectively, the "CAID Plaintiffs") are persons who were present at the CAID when it was raided by Detroit police on May 31, 2008.  They were detained, searched, and charged with loitering in a place of illegal occupation.  Kaiser, Wong, Price, Washington, and Leverette-Saunders were victims of excessive force by the police.  Mobley, Wong, Price, Leverette-Saunders, Hellenberg, and Mahler had their cars impounded during the raid.

10.     Plaintiffs Kimberly Mobley, Jerome Price, Wanda Leverette, and Laura Mahler (collectively, "Parent Plaintiffs") are parents of four CAID Plaintiffs.  They were not present at the CAID but they are each the owner of a car that a CAID Plaintiff was driving, with permission, on or about May 31, 2008.  They are parties to this lawsuit so that they may assert their property rights with respect to their cars.

a.     Kimberly Mobley is the mother of Ian Mobley and the owner of the car Ian Mobley was driving on or about May 31, 2008.

b.     Jerome Price is the father of Nathaniel Price and the owner of the car Nathaniel Price was driving on or about May 31, 2008.

c.     Wanda Leverette is the mother of Jason Leverette-Saunders and the owner of the car Jason Leverette-Saunders was driving on or about May 31, 2008.

d.     Laura Mahler is the mother of Thomas Mahler and the owner of the car Thomas Mahler was driving on or about May 31, 2008.

11.     Defendant City of Detroit is a municipal corporation organized under the laws of the State of Michigan.  The Detroit Police Department is a division or department of the City of Detroit.

12.     Defendant Vicki Yost is, or was at all times relevant to this Complaint, a City of Detroit police lieutenant assigned to the vice squad of the Detroit Police Department.  Lieutenant Yost is being sued in her individual capacity.

13.     Defendant Daniel Buglo is, or was at all times relevant to this Complaint, a City of Detroit police sergeant assigned to the vice squad of the Detroit Police Department.  Sergeant Buglo is being sued in his individual capacity.

14.     Defendants Unnamed Detroit Police Officers are, or were at all times relevant to this Complaint, City of Detroit police officers employed by the Detroit Police Department.  They are all the police officers, in addition to Defendants Yost and Buglo, who participated in the CAID raid on May 31, 2008.  They are being sued in their individual capacities.  Their number and identities are currently unknown to Plaintiffs, and Plaintiffs intend to amend this Complaint to name them individually as soon as their number and identities are disclosed.

## FACTS

**The Contemporary Art Institute of Detroit**

15.     The CAID is a well-established private not-for-profit arts organization serving the Detroit community.  Founded in 1979 as an artists' collective to host contemporary art exhibits in various venues throughout the area, the CAID acquired permanent space at 5141 Rosa Parks Boulevard, near Wayne State University, in 2005.  By May 2008 the CAID operated three galleries, all in the City of Detroit.

16.     The CAID is recognized as an organization dedicated to improving the cultural and community life of Detroit.  For example, in 2008, the CAID hosted the Eco Village Student Design Competition as part of the City of Detroit's "green initiative."  Teams of architecture students from the University of Detroit Mercy, Lawrence Technological University, and the University of Michigan each designed an eco-village on a five-acre site in the Woodbridge neighborhood.  The competition sought innovative, environmentally friendly and affordable solutions for Detroit's vacant lands.  Significantly, the City of Detroit is a sponsor of this competition, which was on display at the CAID on the night of the raid.

17.     In addition to art and architecture exhibits, the CAID hosts lectures, visual arts performances, concerts, and special events.

18.   Admission to the CAID's galleries is free and open to the general public during the day.  Some special events, such as the one that was raided on May 31, 2008, are open only to members.

19.   The CAID offers two levels of general membership: $3.00 for a monthly membership and $20.00 for a yearly basic membership.  Members receive e-newsletters and cards announcing exhibitions and special events.

**Funk Night**

20.   Beginning in December 2000, the CAID (or the Detroit Contemporary, its predecessor organization at 5141 Rosa Parks Boulevard) hosted "Funk Night" on the last Friday night of every month.

21.   Funk Night was a widely and openly advertised members-only event that began at midnight and ended at 5:00 a.m.

22.   Funk Night featured a dance floor and a disc jockey playing a wide array of funk, soul and groove records.

23.   The CAID's Funk Night patrons were predominantly in their early twenties, and most were college students, recent graduates, and young professionals.  They were all people who gathered for the common purposes of socializing, listening to music, and expressing themselves through dance and song.

24.   At Funk Night, the CAID kept a membership list at the door.  People wishing to enter who were not on the list were first required to become members.

25.   Because alcohol was available at Funk Night, members were asked to show a driver's license or other acceptable form of identification.  Members aged 21 and over were given

6

wrist bands indicating that they could be served alcohol.  Members under 21 were permitted to enter but not permitted to drink.

**The CAID Raid**

26.    On May 31, 2008, Defendants Yost and Buglo went to Funk Night at the CAID in an undercover capacity.  No one knew they were police officers.

27.    By 2:00 a.m., there were approximately 130 member-patrons at Funk Night.  They were by all appearances engaged in innocent social activity such as singing, dancing, listening to music, and -- among those of legal drinking age -- consuming alcohol.  Yost and Buglo did not observe the CAID's approximately 130 patrons, including CAID Plaintiffs, engaged in or about to be engaged in any criminal activity.

28.    Shortly after 2:00 a.m., at Lieutenant Yost's direction, a large group of police officers (designated above as Unnamed Detroit Police Officers) stormed into the CAID.

29.    At all relevant times the unnamed police officers acted under the control or supervision of Yost or Buglo.

30.    The police officers were clad in paramilitary commando-style gear: they were wearing dark masks, dressed entirely in black, and had flashlights mounted on shotguns.  The officers ran throughout the premises pointing guns in the faces of the CAID's terrified patrons, including some CAID Plaintiffs, with their fingers on the triggers, swearing and screaming commands such as "Lie down on the f***ing ground!"

31.    The officers did not announce themselves as police as they ran through the CAID, and many of the CAID's patrons, including some CAID Plaintiffs, initially believed they were actually armed robbers.  Although the officers were identified as police in small writing on their

7

clothes, many of the CAID's patrons could not see the writing because it was dark and the officers were shining flashlights in their eyes.

32.     When the raid began, many of the CAID's patrons, including some CAID Plaintiffs, were standing in a fenced-in back yard area just outside the gallery.  As it had recently rained, the ground soil was damp and muddy.  The police officers ordered everyone to lie face down on the ground.  When some patrons were initially slow to lie face down in the mud, they were violently shoved, kicked, or tackled to the ground by the police officers.

33.     Some patrons asked what was happening or asked to see a police badge.  Several of these requests, including those of some CAID Plaintiffs, were met with physical violence by the police officers, who continued to shove, kick, and hit even those patrons who were already lying face-down on the ground or in the mud.

**Everyone at the CAID Detained, Searched, and Ticketed**

34.     The police officers ordered the CAID's patrons to remain on the ground for up to 30 minutes while they searched each person.  Some people, including some CAID Plaintiffs, were searched multiple times by different officers.

35.     The police officers refused to answer patrons' questions, including those of some CAID Plaintiffs, about why they were being detained and searched.

36.     The police officers then ordered the patrons, including the CAID Plaintiffs, to divide by gender and walk in single-file rows with their hands on their heads into the main gallery of the CAID.

37.     Once in the main gallery, the patrons, including the CAID Plaintiffs, were ordered by the police officers to kneel with their hands on their heads.

8

38.    Each patron's pockets were emptied, including those of the CAID Plaintiffs, either by a police officer or as ordered by a police officer, and their belongings placed in clear plastic bags.  The plastic bags were taken to the front of the main gallery, where the police had set up tables and a *de facto* "command center" for the raid.

39.    The police officers continued to refuse to answer the patrons' questions, including some CAID Plaintiffs', about why they were being detained and their personal property confiscated.

40.    The police officers sifted through hundreds of plastic bags which they knew to contain the personal belongings of everyone, including the CAID Plaintiffs, who happened to be physically present at the CAID when the raid took place.  Based on the identification they found in each bag, one by one each of the CAID's detained patrons was called to the front of the room to be interrogated and ticketed by the police.

41.    This process took over three hours.  Some of the CAID's patrons were required to kneel on the hardwood floor with their hands on their head the entire time.  Their requests to be allowed to sit more comfortably during the several hours they waited for their names to be called were denied.

42.    After being detained for hours, each CAID patron, including each of the CAID Plaintiffs, was ultimately issued a misdemeanor citation for "loiter[ing] in a place of illegal occupation" in violation of section 38-5-1 of the Detroit City Code.  In total, approximately 130 loitering citations were issued.

43.    The police officers issued no citations for possession of illegal drugs or weapons or underage alcohol consumption.  The only crime allegedly committed by the CAID's

9

approximately 130 patrons, including the CAID Plaintiffs, was simply being present during Funk Night.

**Impoundment of Cars**

44.   After receiving a loitering citation, each patron was asked by a police officer if he or she drove to the CAID that night.  If the answer was no, that person was free to leave.  Patrons who drove, including some CAID Plaintiffs, were told that their car was being impounded.  They were advised to remove personal items from their car before it was towed away.

45.   Patrons whose cars were towed, including some CAID Plaintiffs, were given a written notice stating that their car had been seized by the police under Michigan's nuisance abatement statute.

46.   According to that statute, a car used for certain illegal purposes may be seized, declared a nuisance, and permanently forfeited to the state.  M.C.L. §§ 600.3801, 600.3825.

47.   In most cases, the owners of the impounded vehicles had to pay $900 plus towing and storage fees to get their cars back.

48.   Some never saw their cars again.

**Information Known to the Police at the Time of the Raid**

49.   Prior to May 31, 2008, Defendants Yost and Buglo investigated the CAID and concluded that the CAID was not properly licensed to host Funk Night.

50.   They obtained a search warrant authorizing them to search the CAID.

51.    The search warrant did not authorize the police to search or seize patrons, such as the CAID Plaintiffs, who simply happened to be present when the search was conducted.  Nor did the search warrant authorize the police to seize their cars.

52.    Just before the raid began, Yost and Buglo were present inside the CAID and had an opportunity to observe that approximately 130 patrons were engaged in seemingly innocent activity.

53.    Neither Yost nor Buglo nor any of the police officers involved in the raid had reason to suspect that any particular patron at the CAID, including any of the CAID Plaintiffs, knew that Funk Night was not properly licensed or that the CAID was in any other way an allegedly unlawful operation.

54.    Nor did Yost, Buglo, or any of the police officers involved in the raid have reason to suspect that any particular person who drove a car to the CAID did so with the knowledge that Funk Night was not properly licensed or that the CAID was in any other way an allegedly unlawful operation.

55.    The only thing Yost, Buglo, and the other police officers knew was that the CAID's approximately 130 patrons, including the CAID Plaintiffs, were physically present at the moment the heavily armed vice squad stormed in.


**Allegations Specific to Each Plaintiff**

### *Ian Mobley and Kimberly Mobley*

56.    On May 31, 2008, Plaintiff Ian Mobley was a 20-year-old college student at Michigan State University.

57.     That evening, he was socializing with some friends from high school and was serving as the designated driver.  Ian was driving his mother's car with her permission.

58.     Ian's friends suggested that they go to Funk Night at the CAID, and Ian agreed.

59.     Ian had never been to Funk Night or the CAID before and had no knowledge as to whether it was properly licensed or in any other way an unlawful operation.

60.     Instead of driving directly to the CAID, Ian parked the car at a friend's house about a mile away from the CAID.  Ian and his friends then walked from their friend's house to the CAID.

61.     Ian arrived at Funk Night at approximately 1:30 a.m.  Ian paid to become a new member of the CAID.  Because he was under age 21, he did not receive a wrist band at the front door and did not consume alcohol.

62.     Ian saw no one engaged in any illegal conduct while at the CAID.  In fact, he observed nothing out of the ordinary until shortly after 2:00 a.m., when a large group of police officers dressed entirely in black, with their faces masked and guns drawn, stormed into CAID and ordered everyone to lie face down on the ground.

63.     Ian was terrified, as the officers did not initially identify themselves as police.  All Ian could see were masked men with guns and flashlights screaming orders.

64.     Ian was standing outdoors at the time of the raid and was forced to lie in the mud for approximately 30 minutes.  He was then ordered to go inside the CAID and kneel with his hands on his head.  As this became increasingly painful, he asked a police officer if he could sit down.  His request was denied.

65.     After being detained for several hours, Ian was called to the front of the main gallery and asked by a police officer how he got to the CAID that evening.  Ian explained that he parked his car at a friend's house about a mile away and walked.

66.     Ian was then placed in handcuffs and ordered to sit against the wall.

67.     A police officer retrieved Ian's car keys from a plastic bag and left the CAID to locate Ian's car.  The officer then drove Ian's car back to the CAID so it could be impounded and towed away.

68.     Ian was given a ticket for loitering in a place of illegal occupation and a notice that his car had been seized under the nuisance abatement statute.  He was released at approximately 5:30 a.m.

69.     The criminal charge against Ian for loitering in a place of illegal occupation was eventually dismissed.

70.     The car Ian was driving that evening was owned by his mother, Plaintiff Kimberly Mobley.

71.     Kimberly Mobley refused to pay $900 plus towing and storage charges to get her car back because it was unlawfully seized.  As a result, she did not have access to her car for over four months.

72.     Only after Kimberly Mobley retained private counsel to represent her interests in forfeiture proceedings did the Wayne County Prosecutor's Office release her car to her custody.

73.     At the time of the raid, none of the police officers involved (including Yost and Buglo) had reason to suspect that Ian knew that Funk Night was not properly licensed or that the CAID was in any other way an allegedly unlawful operation.

74.     Nor did the Defendant officers (including Yost and Buglo) have any reason to suspect that Ian used the car he was driving unlawfully or for an unlawful purpose.

75.     The only thing they knew about Ian and his activities that night -- the only basis upon which they detained, searched, and ticketed him and then impounded his mother's car -- was that he was merely present at the CAID at the moment they stormed in.

76.     Defendants' conduct proximately caused Ian Mobley to suffer physical pain, emotional distress and humiliation, the inconvenience and personal aggravation of defending himself against frivolous criminal charges, the loss of the use of his mother's car, and other pecuniary and non-pecuniary damages to be proved at trial.

77.     Ian now refuses to go out to bars, nightclubs, and other establishments in the City of Detroit because he fears that he will be detained, searched, assaulted, and ticketed by Defendants solely because of his innocent presence in a place that he does not know is not properly licensed or is in some other way an allegedly unlawful operation.  But for his fear that such an incident will happen again, Ian would continue to socialize in Detroit at bars, nightclubs, and other establishments he believes to be lawful.

78.     Defendants' conduct proximately caused Kimberly Mobley to suffer the loss of the use of her car, the inconvenience and personal aggravation of defending against frivolous charges that her car was an abatable nuisance under state law, emotional distress and mental anguish, and other pecuniary and non-pecuniary damages to be proved at trial.

79.     Kimberly now refuses to drive her car into the City of Detroit unless absolutely necessary because she fears that it will be seized by Defendants solely because it is driven to or parked nearby a place that she does not know is not properly licensed or is in some other way an allegedly unlawful operation.  Kimberly also instructs her children, who drive her car, not to

14

drive into the City of Detroit unless absolutely necessary based on the fear that her car will be

seized by Defendants solely because it is driven to or parked nearby a place that her children do

not know is not properly licensed or is in some other way an allegedly unlawful operation.  But

for her fear that  her car will be seized in such a manner, Kimberly would be more likely to visit

the City of Detroit and more likely to encourage her children to drive her car into the City of

Detroit for social and cultural events.

### *Paul Kaiser and Angie Wong*

80.    On May 31, 2008, Plaintiff Paul Kaiser was a 37-year-old attorney from Oakland
County.

81.    His girlfriend, Plaintiff Angie Wong, was a 22-year-old resident of St. Clair Shores.

82.    That evening, Paul was spending time with his older brother, who was visiting from

Baltimore.  Paul and his brother went to a bar in downtown Detroit to watch the Detroit Pistons

play the Boston Celtics in game 6 of the NBA eastern conference finals.  Just as the game was

ending, Angie joined Paul and his brother, and the three of them continued to socialize in and

near Detroit.

83.    At approximately 1:30 a.m., Angie received a phone call from a friend who said he

was at the CAID and needed a ride home.  Paul agreed to accompany Angie to the CAID to pick

up her friend.

84.    Paul had never been to Funk Night or the CAID before and had no knowledge as to

whether it was properly licensed or in any other way an unlawful operation.

85.    Angie had been to Funk Night on previous occasions but was not aware of any

illegal activity on those occasions.  Like Paul, she had no knowledge as to whether it was

properly licensed or in any other way an unlawful operation.

86.     Angie drove her car to the CAID and parked nearby.

87.     Angie and Paul entered the CAID at approximately 1:50 a.m.  They paid an entrance fee and both received wrist bands indicating they were over 21.

88.     They saw no illegal activity taking place and observed nothing out of the ordinary, but within a few minutes Paul suggested they leave the CAID because Angie's friend was not there and most of the CAID's patrons were significantly younger than Paul.

89.     Just as Angie and Paul were getting ready to leave, a large group of police officers stormed into the CAID and ordered everyone to lie on the ground.

90.     Angie and Paul were terrified and feared for their lives.  The officers did not announce themselves as police as they ran through the CAID, leading Angie and Paul initially to believe they were armed robbers.  Instead of wearing standard police uniforms, the officers were dressed entirely in black and their faces were covered in ski masks.

91.     Angie and Paul were standing outdoors at the time of the raid in a particularly muddy area.

92.     Instead of lying down, Paul assumed a kneeling position, placed his hands on his head, and hunched forward to face the ground.  When one of the police officers approached Paul, Paul stated that he was an attorney and asked the officer what was happening.

93.     The officer did not respond to Paul's question.  Instead, the officer violently kicked Paul several times in the back and stomped on him as he fell forward into the mud.  As the officer kicked and stomped on Paul, the officer pointed his gun at the back of Paul's head.

94.     After kicking and stomping on Paul until he was face down in the mud, the officer placed Paul in handcuffs with his hands behind his back.

95.   Angie was wearing white shoes, a white shirt, and light jeans.  Instead of lying in the mud, Angie crouched down in a squatting position with her hands behind her head.

96.   One of the police officers approached Angie and yelled, "Bitch, you think you're too pretty to get in the mud?  Get in the mud!"  The officer then violently kicked Angie in the back and stomped on her as she fell forward into the mud.

97.   Angie and Paul were separated and detained inside the CAID for several hours. Eventually, each was called to the front of the gallery and given tickets for loitering in a place of illegal occupation.  Angie was given a notice that her car had been seized under the nuisance abatement statute.  They were released at approximately 4:00 a.m.

98.   The criminal charges against them for loitering in a place of illegal occupation were eventually dismissed.

99.   Angie had to pay $900 plus towing and storage charges to get her car back.

100.   At the time of the raid, none of the police officers involved (including Yost and Buglo) had reason to suspect Paul or Angie knew that Funk Night was not properly licensed or that the CAID was in any other way an unlawful operation.

101.   Nor did the Defendant officers (including Yost and Buglo) have reason to suspect that Angie used her car unlawfully or for an unlawful purpose.

102.   The only thing they knew about Paul and Angie and their activities that night -- the only basis upon which they detained, searched, assaulted, and ticketed them and then impounded Angie's car -- was that Paul and Angie were merely present at the CAID at the moment they stormed in.

103.   Defendants' conduct proximately caused Paul to suffer physical pain and injury, emotional distress and humiliation, the inconvenience and personal aggravation of defending

himself against frivolous criminal charges, and other pecuniary and non-pecuniary damages to be proved at trial.

104.   Defendants' conduct proximately caused Angie to suffer physical pain and injury, emotional distress and humiliation, the inconvenience and personal aggravation of defending herself against frivolous criminal charges, the loss of the use of her car, the inconvenience and cost of recovering her car, and other pecuniary and non-pecuniary damages to be proved at trial.

105.   Paul and Angie continue to go to restaurants, bars, and other seemingly legitimate establishments in the City of Detroit, but they now fear that they will be detained, searched, assaulted, and ticketed by Defendants solely because of their innocent presence in a place that they do not know is not properly licensed or is in some other way an allegedly unlawful operation.  They also fear that their cars will be seized by Defendants solely because they drive to or park near such a place and walk inside.

### *James Washington*

106.   On May 31, 2008, Plaintiff James Washington was a 27-year-old security supervisor at a charter school in Detroit.

107.   That evening, James was socializing at a friend's house in Detroit.  His friend suggested that they go to Funk Night at the CAID, and James agreed.

108.   James had never been to Funk Night or the CAID before and had no knowledge as to whether it was properly licensed or in any other way an unlawful operation.

109.   James entered the CAID at approximately 12:30 a.m.  He showed his driver's license and paid an entrance fee.

110.   For approximately 90 minutes, he observed nothing out of the ordinary.  James saw no one engaged in illegal conduct.  Nothing James experienced at the CAID suggested that he

18

was in a place or at an event that was not properly licensed or was in any other way an unlawful operation.

111.   Shortly after 2:00 a.m., a large group of police officers, with their faces masked and guns drawn, stormed into the CAID and ordered everyone to lie on the ground.

112.   James was terrified, as the officers did not initially identify themselves as police. All James could see were masked men with guns and flashlights screaming orders.

113.   James was standing outdoors at the time of the raid in a muddy area.  He did not instantly drop to the ground, as he was wearing an expensive white shirt, designer jeans, and dress shoes.

114.   Almost immediately, an armed police officer approached James, pointed a shotgun at his face, and violently tackled him to the ground.  Once James was on the ground, the police officer stepped on him and told him to put his face in the mud.

115.   Over the next 15-30 minutes, multiple police officers patted James down and searched his pockets.  One of the officers kicked him and physically shoved his face into the mud.

116.   James was next ordered to go inside the CAID and kneel with his hands on his head for approximately two hours.

117.   At one point James became numb, fell to one side, and tried to stretch.  A police officer ran up to him, kicked him, and ordered him to get back on his knees.

118.   After being detained for several hours, James was called to the front of the main gallery and given a ticket for loitering in a place of illegal occupation.  He was released at approximately 5:00 a.m.

119.   The criminal charge against him for loitering in a place of illegal occupation was eventually dismissed.

120.   At the time of the raid, none of the police officers involved (including Yost and Buglo) had reason to suspect that James knew that Funk Night was not properly licensed or that the CAID was in any other way an allegedly unlawful operation.

121.   The only thing they knew about James and his activities that night -- the only basis upon which they detained, searched, assaulted, and ticketed him -- was that he was merely present at the CAID at the moment they stormed in.

122.   Defendants' conduct proximately caused James to suffer physical pain and injury, emotional distress and humiliation, the inconvenience and personal aggravation of defending himself against frivolous criminal charges, and other pecuniary and non-pecuniary damages to be proved at trial.

123.   James now refuses to go out to bars, nightclubs, and other establishments in the City of Detroit because he fears that he will be detained, searched, assaulted, and ticketed by Defendants solely because of his innocent presence in a place that he does not know is not properly licensed or is in some other way an allegedly unlawful operation.  But for his fear that such an incident will happen again, James would continue to socialize in Detroit at bars, nightclubs, and other establishments he believes to be lawful.

### *Nathaniel Price and Jerome Price*

124.   On May 31, 2008, Plaintiff Nathaniel Price was a 20-year-old college student at Wayne County Community College.

125.   That evening, Nathaniel and two of his friends decided to go to Funk Night at the CAID.  Nathaniel had been to Funk Night before but was not aware of any illegal activity on

those occasions.  He had no knowledge as to whether it was properly licensed or in any other way an unlawful operation.

126.  Nathaniel was driving his father's car with his permission.  He drove himself and two of his friends to the CAID and parked nearby.

127.  Nathaniel entered the CAID at approximately 2:00 a.m.  Because Nathaniel was under age 21, he did not receive a wrist band at the front door and did not consume alcohol.

128.  Almost immediately after Nathaniel arrived, and while Nathaniel was standing just inside the front door of the CAID, a large group of masked officers stormed into the building and rushed toward him.  The officers did not identify themselves as police.  They pointed shotguns directly at Nathaniel and yelled at him to "get down on the f***ing ground."

129.  Nathaniel tripped and fell to the ground as the police stormed the CAID, pushing and wrestling its patrons to the floor.

130.  Nathaniel remained on the floor for approximately 30 minutes while police searched everyone in the room.  He was eventually ordered to go into another room and kneel with his hands on his head for over an hour while police sifted through the personal belongings of everyone at the CAID.

131.  After being detained for several hours, a police officer called Nathaniel to the front of the main gallery and issued him a citation for loitering in a place of illegal occupation.

132.  As Nathaniel turned to leave the CAID, another police officer stopped him and asked him if he had driven to the CAID that night.  Nathaniel said yes, and the officer told him to retrieve whatever he wanted from his car because it was being towed away.  The police officer told Nathaniel that he would get his car back the following Monday, June 2, 2008.

133.  After his car was towed away, Nathaniel and his friends began walking up Woodward Avenue in the middle of the night wondering how they would get home.  Eventually they were able to get in touch with a friend from Sterling Heights who was willing to come pick them up.

134.  The criminal charge against Nathaniel for loitering in a place of illegal occupation was eventually dismissed.

135.  The car Nathaniel was driving that evening was owned by his father, Plaintiff Jerome Price.

136.  Jerome was outraged that his car had been seized simply because Nathaniel had been present at the CAID.  However, he was told that he must pay $900 plus towing and storage charges to get his car back.

137.  Eventually, on or about June 26, 2008, Jerome agreed to pay the $900 plus towing and storage charges.

138.  After Jerome paid the $900, the Wayne County Prosecutor's Office told Jerome it would "release" the car to his custody and instructed Jerome to go to the tow yard to retrieve it.

139.   When Jerome arrived at the tow yard, he was told his car was not there, and he was sent to another tow yard several miles away.  The second tow yard tried to give him someone else's car.

140.  Eventually, Jerome was informed that his car had been stolen off the lot of the first tow yard several weeks earlier.  The operator of the tow yard from which the car had been stolen told Jerome that he had called the police to report the car stolen but that the police had refused to take a report.

141.  Jerome immediately called the police to report his car stolen, but it had already been missing for several weeks.

142.  The tow yard operator waived the towing and storage fee because Jerome's car had been stolen off the lot.  However, the Wayne County Prosecutor's Office refused to refund his $900.

143.  Jerome never saw his car again.

144.  At the time of the raid, none of the police officers involved (including Yost and Buglo) had reason to suspect Nathaniel knew that Funk Night was not properly licensed or that the CAID was in any other way an unlawful operation.

145.  Nor did the Defendant officers (including Yost and Buglo) have reason to suspect that Nathaniel used the car he was driving unlawfully or for an unlawful purpose.

146.  The only thing they knew about Nathaniel and his activities that night -- the only basis upon which they detained, searched, assaulted, and ticketed him and then impounded his father's car -- was that he was merely present at the CAID at the moment they stormed in.

147.  Defendants' conduct proximately caused Nathaniel Price to suffer physical pain, emotional distress and humiliation, the inconvenience and personal aggravation of defending himself against frivolous criminal charges, the loss of the use of his father's car, the loss of personal property that was in his father's car when it was improperly seized, and other pecuniary and non-pecuniary damages to be proved at trial.

148.  Nathaniel now goes out to substantially fewer bars, nightclubs, and other establishments in the City of Detroit because he fears that he will be detained, searched, assaulted, and ticketed by Defendants solely because of his innocent presence in a place that he does not know is not properly licensed or is in some other way an allegedly unlawful operation.

But for his fear that such an incident will happen again, Nathaniel would not hesitate to socialize in Detroit at bars, nightclubs, and other establishments he believes to be lawful.

149.  Defendants' conduct proximately caused Jerome Price to suffer the permanent loss of his car, loss of wages, the inconvenience and cost of recovering a car that was never returned to him, emotional distress and mental anguish, and other pecuniary and non-pecuniary damages to be proved at trial.

150.  Jerome is now extremely hesitant to enter the City of Detroit unless absolutely necessary because he fears the police and no longer believes he can count on them as the allies of law-abiding citizens such as himself.  But for his fear of the police caused by the CAID raid and the unlawful seizure of his car, Jerome would be more likely to visit the City of Detroit.

### Stephanie Hollander

151.  On May 31, 2008, Plaintiff Stephanie Hollander was a 20-year-old college student at Western Michigan University.

152.  That evening she was with a group of friends who occasionally attend Funk Night at the CAID on the last Friday of the month.

153.  Stephanie had been to Funk Night before but was not aware of any illegal activity on those occasions.  She had no knowledge as to whether it was properly licensed or in any other way an unlawful operation.

154.  Stephanie and her friends entered that CAID at approximately 1:00 a.m.  Stephanie paid a fee and filled out a form to renew her membership to the CAID.  Because she was under age 21, she did not receive a wrist band at the front door and did not consume alcohol.

155.  For approximately an hour, Stephanie observed nothing out of the ordinary.  She saw no one engaged in illegal conduct.  Nothing Stephanie experienced at the CAID suggested

that she was in a place or at an event that was not properly licensed or was in any other way an unlawful operation.

156.   Stephanie and her friends danced to funk music inside the CAID before walking outdoors to catch some fresh air in the back yard.  There, they decided to add their own twist to Funk Night by singing some of their favorite Disney songs.

157.   Shortly after 2:00 a.m., while Stephanie and her friends were singing "Hakuna Matata" from Disney's *The Lion King*, a large group of Detroit police officers, dressed entirely in black, with their faces masked and guns drawn, stormed into CAID and ordered everyone to lie face down on the ground, including those on the wet ground in the back yard.

158.   Stephanie was terrified, as the officers did not initially identify themselves as police.  All Stephanie could see were masked men with guns and flashlights ordering everyone to lie in the mud.

159.   Stephanie was forced to lie face-down in the mud with her hands on her head for 15 to 30 minutes while police officers searched everyone in the back yard.

160.   Eventually Stephanie and her friends were ordered to move indoors, where they were detained for several hours while police sifted through the personal belongings of everyone at the CAID.

161.   After several hours, Stephanie was finally called to the front of the main gallery and issued a citation for loitering in a place of illegal occupation.

162.   Stephanie was not permitted to leave the CAID until approximately 5:00 a.m.

163.   The criminal charge against Stephanie for loitering in a place of illegal occupation was eventually dismissed.

164.   At the time of the raid, none of the police officers involved (including Yost and Buglo) had reason to suspect that Stephanie knew that Funk Night was not properly licensed or that the CAID was in any other way an allegedly unlawful operation.

165.   The only thing they knew about Stephanie and her activities that night -- the only basis upon which they detained, searched, and ticketed her -- was that she was merely present at the CAID at the moment they stormed in.

166.   Defendants' conduct proximately caused Stephanie to suffer emotional distress and humiliation, the inconvenience and personal aggravation of defending herself against frivolous criminal charges, and other pecuniary and non-pecuniary damages to be proved at trial.

### Jason Leverette-Saunders and Wanda Leverette

167.   On May 31, 2008, Plaintiff Jason Leverette-Saunders was a 25-year-old resident of Detroit and a student attending online classes at Colorado Technical University.

168.   That evening, Jason decided to go to Funk Night at the CAID.  Jason had been to Funk Night before but was not aware of any illegal activity on those occasions.  He had no knowledge as to whether it was properly licensed or in any other way an unlawful operation.

169.   Jason was driving his mother's car with her permission.  He drove that car to the CAID and parked nearby.

170.   Jason entered the CAID at approximately 12:45 a.m.  He showed his driver's license and paid an entrance fee.

171.   While at the CAID, Jason met some acquaintances, socialized, looked at the art on display, and danced.  For over an hour, he observed nothing out of the ordinary.  Jason saw no one engaged in illegal conduct.  Nothing Jason experienced at the CAID suggested that he was in

a place or at an event that was not properly licensed or was in any other way an unlawful operation.

172.  Shortly after 2:00 a.m., police officers stormed into the CAID and ordered everyone to lie on the ground.

173.  The officers did not announce themselves as police as they ran through the CAID. All Jason could see were masked men dressed entirely in black waving guns and flashlights and ordering everyone to lie in the mud.

174.  As a consequence, Jason feared that he and the others were being robbed so he demanded of the officers, "I want to see your badge."

175.  As soon as he said this, Jason was snatched by a police officer, violently thrown to the ground, and handcuffed.

176.  One or more police officers continued to assault Jason, violently kicking him even after he was on the ground and handcuffed.

177.  After being detained for several hours, Jason was issued a citation for loitering in a place of illegal occupation.  A police officer informed him that the car he drove to the CAID was being impounded and towed away.

178.  The criminal charge against Jason for loitering in a place of illegal occupation was eventually dismissed.

179.  The car that Jason had driven that evening was owned by his mother, Plaintiff Wanda Leverette.

180.  Wanda could not get her car back until she paid $900 plus towing and storage charges.  She did not have that much cash available and had to borrow that money from Jason's father.  Her car was not released until Friday, June 6, a week after the raid.

181.  During that week Wanda was unable to work because her car was her only means of transportation to and from her job.

182.  At the time of the raid, none of the police officers involved (including Yost and Buglo) had reason to suspect Jason knew that Funk Night was not properly licensed or that the CAID was in any other way an unlawful operation.

183.  Nor did the Defendant officers (including Yost and Buglo) have reason to suspect that Jason used the car he was driving unlawfully or for an unlawful purpose.

184.  The only thing they knew about Jason and his activities that night -- the only basis upon which they detained, searched, assaulted, and ticketed him and then impounded his mother's car -- was that he was merely present at the CAID at the moment they stormed in.

185.  Defendants' conduct proximately caused Jason Leverette-Saunders to suffer physical pain and injury, emotional distress and humiliation, the inconvenience and personal aggravation of defending himself against frivolous criminal charges, the loss of the use of his mother's car, and other pecuniary and non-pecuniary damages to be proved at trial.

186.  Jason now refuses to go out to most bars, nightclubs, and other establishments in the City of Detroit because he fears that he will be detained, searched, assaulted, and ticketed by Defendants solely because of his innocent presence in a place that he does not know is not properly licensed or is in some other way an allegedly unlawful operation.  But for his fear that such an incident will happen again, Jason would continue to socialize in Detroit at bars, nightclubs, and other establishments he believes to be lawful.

187.  Defendants' conduct proximately caused Wanda Leverette to suffer the loss of the use of her car, loss of wages, emotional distress and mental anguish, the inconvenience and cost of recovering her car, and other pecuniary and non-pecuniary damages to be proved at trial.

188.   Wanda is now extremely hesitant to allow Jason to drive her car late at night in the City of Detroit, because she fears that it will be seized by Defendants solely because it is driven to or parked nearby a place that he does not know is not properly licensed or is in some other way an allegedly unlawful operation.   But for her fear that her car will be seized in such a manner, Wanda would allow Jason to use her car to drive to bars, nightclubs, and other establishments in the City of Detroit he believes to be lawful.

### *Darlene Hellenberg*

189.   On May 31, 2008, Plaintiff Darlene Hellenberg was a 26-year-old library assistant at the Ferndale Public Library.

190.   That evening she was with a group of friends who occasionally attend Funk Night at the CAID on the last Friday of the month.   Darlene and her friends knew the disc jockey that night, and they wanted to hear him spin music.   Darlene also wanted to hang out with her friends and dance.   They were celebrating a friend's birthday that night.

191.   Darlene had been to Funk Night before but was not aware of any illegal activity on those occasions.   She had no knowledge as to whether it was properly licensed or in any other way an unlawful operation.

192.   Darlene drove her car to the CAID and parked nearby.

193.   Darlene and her friends entered the CAID at approximately 1:00 a.m.   For approximately an hour, she observed nothing out of the ordinary.   Darlene saw no one engaged in illegal conduct.   Nothing Darlene experienced at the CAID suggested that she was in a place or at an event that was not properly licensed or was in any other way an unlawful operation.

194.   Shortly after 2:00 a.m., Darlene and her friends were on the dance floor inside the CAID when a large group of police officers stormed in.   Darlene was terrified, as the officers did

not initially identify themselves as police and were not wearing police uniforms. All she could see were men wearing masks and bandanas, holding guns and flashlights, ordering everyone to drop to the floor.

195. After being detained for several hours, Darlene was called to the front of the main gallery and issued a citation for loitering in a place of illegal occupation. A police officer informed her that her car was being impounded and that she should retrieve personal items before it was towed away.

196. The criminal charge against Darlene for loitering in a place of illegal occupation was eventually dismissed.

197. Darlene was initially told that she would have to pay $900 plus towing and storage fees to get her car back. However, that amount was later reduced to $400 if she agreed to perform community service by giving a speech to teenagers about "the lessons she learned" from the CAID raid.

198. Darlene's car was finally returned to her on or about March 30, 2009, approximately ten months after it was seized.

199. At the time of the raid, none of the police officers involved (including Yost and Buglo) had reason to suspect that Darlene knew that Funk Night was not properly licensed or that the CAID was in any other way an allegedly unlawful operation.

200. Nor did the Defendant officers (including Yost and Buglo) have reason to suspect that Darlene used her car unlawfully or for an unlawful purpose.

201. The only thing they knew about Darlene and her activities that night -- the only basis upon which they detained, searched, and ticketed her and then impounded her car -- was that she was merely present at the CAID at the moment they stormed in.

202.   Defendants' conduct proximately caused Darlene to suffer the inconvenience and personal aggravation of defending herself against frivolous criminal charges, the loss of the use of her car, the inconvenience and cost of recovering her car, the embarrassment of giving a speech to teenagers about the "lessons" she learned from the CAID raid when she was in fact completely innocent of wrongdoing, emotional distress and humiliation, and other pecuniary and non-pecuniary damages to be proved at trial.

### *Thomas Mahler and Laura Mahler*

203.   On May 31, 2008, Plaintiff Thomas Mahler was a 20-year-old college student at Wayne State University.

204.   That evening, Thomas was at a party in Detroit when he learned that several of his friends were at the CAID for Funk Night.  At approximately 1:50 a.m., Thomas went to the CAID to meet up with his friends.

205.   Thomas had been a member of the CAID for several months.  He had been to Funk Night before but was not aware of any illegal activity on those occasions and had no reason to know it was not properly licensed or was in any other way an unlawful operation.

206.   Thomas was driving his mother's car with her permission.  He drove to the CAID and parked nearby.

207.   Because Thomas was under age 21, he did not receive a wrist band at the front door and did not consume alcohol.

208.   Thomas saw no one engaged in any illegal conduct.  In fact, he observed nothing out of the ordinary until shortly after 2:00 a.m., when a large group of police officers dressed entirely in black, with their faces masked and guns drawn, stormed into the CAID and ordered everyone to lie on the ground.

31

209.   Thomas was terrified, as the officers did not initially identify themselves as police. All Thomas could see were masked men with guns and flashlights screaming orders.

210.   Thomas was standing outdoors at the time of the raid and was forced to lie in the mud while everyone in the back yard was searched.  He was then ordered to go inside the CAID and kneel with his hands on his head for several hours.

211.   Thomas watched in horror as anyone who asked questions was violently assaulted by the police.

212.   After being detained for several hours, Thomas was called to the front of the main gallery and issued a citation for loitering in a place of illegal occupation.  A police officer informed him that his car was being impounded.

213.   Thomas was told to sign several pieces of paper.  The police told him that if he did not sign as directed, he would be arrested and taken to jail.

214.   Thomas was not released until after 5:00 a.m.

215.   The criminal charge against Thomas for loitering in a place of illegal occupation was eventually dismissed.

216.   The car Thomas was driving that evening was owned by his mother, Plaintiff Laura Mahler.

217.   Laura could not get her car back until she paid $900 plus towing and storage charges.  She did not have that much cash available and had to borrow that money from Thomas's grandfather.  Her car was not released until June 25, 2008, more than three weeks after it was seized.

218.   Laura's car was in a damaged condition when it was finally returned to her.  She was not reimbursed for this damage.

219.  At the time of the raid, none of the police officers involved (including Yost and Buglo) had reason to suspect Thomas knew that Funk Night was not properly licensed or that the CAID was in any other way an unlawful operation.

220.  Nor did the Defendant officers (including Yost and Buglo) have reason to suspect that Thomas used the car he was driving unlawfully or for an unlawful purpose.

221.  The only thing they knew about Thomas and his activities that night -- the only basis upon which they detained, searched, and ticketed him and then impounded his mother's car -- was that he was merely present at the CAID at the moment they stormed in.

222.  Defendants' conduct proximately caused Thomas Mahler to suffer emotional distress and humiliation, the inconvenience and personal aggravation of defending himself against frivolous criminal charges, the loss of the use of his mother's car, and other pecuniary and non-pecuniary damages to be proved at trial.

223.  Thomas now goes out to substantially fewer bars, nightclubs, and other establishments in the City of Detroit because he fears that he will be detained, searched, assaulted, and ticketed by Defendants solely because of his innocent presence in a place that he does not know is not properly licensed or is in some other way an allegedly unlawful operation. But for his fear that such an incident will happen again, Thomas would not hesitate to socialize in Detroit at bars, nightclubs, and other establishments he believes to be lawful.

224.  Defendants' conduct proximately caused Laura Mahler to suffer the loss of the use of her car, damage to her car, emotional distress and mental anguish, the inconvenience and cost of recovering her car, and other pecuniary and non-pecuniary damages to be proved at trial.

225.  Laura continues to allow Thomas to drive her car in the City of Detroit, but she now fears that it will be seized by Defendants solely because Thomas innocently enters a place he

does not know is not properly licensed or is in some other way an allegedly unlawful operation and leaves his car parked nearby.

**Facts Relevant to Municipal Custom, Policy, or Practice**

226.  The Detroit Police Department's vice squad routinely raids after-hours establishments or events in much the same manner as occurred here and has been doing so for many years.

227.  The vice squad's general practice is as follows:  Undercover officers gather evidence that a bar, nightclub, or other place is selling alcohol or operating late into the night. The investigating officer then consults the appropriate state regulatory agency to determine whether the sale or operation is licensed.  If there is no license, the officer obtains a search warrant to aid in the abatement of the establishment as a public nuisance.  The vice squad then executes the search warrant by sending a large team of disguised, heavily armed officers into the location with an amount of force that is objectively unreasonable under the circumstances and needlessly risks physical injury and emotional trauma to innocent persons inside.  Upon executing the search warrant, the vice squad and its officers detain, search, and ticket every person who is present for "loitering in a place of illegal occupation," even if there is no basis for suspecting each person knows that the place is illegal.  Then, the vice squad seizes the cars of everyone whose car is parked nearby, even if there is no basis for suspecting the cars were knowingly used for any unlawful purpose.  The cars' owners may recover their property by paying $900 plus towing and storage.

228.  On February 15, 2004, a vice squad raid resulted in 21 citations for loitering in a place of illegal occupation and 8 vehicle seizures under the nuisance abatement statute.

34

229.  On March 21, 2005, a vice squad raid resulted in 145 citations for loitering in a place of illegal occupation and 33 vehicle seizures under the nuisance abatement statute.

230.  On March 26, 2005, a vice squad raid resulted in 185 citations for loitering in a place of illegal occupation and 35 vehicle seizures under the nuisance abatement statute.

231.  On December 13, 2008, a vice squad raid resulted in 86 citations for loitering in a place of illegal occupation and an unknown number of vehicle seizures under the nuisance abatement statute.

232.  Upon information and belief, the vice squad has engaged in many similar raids on other unlicensed establishments.

233.  This clear and persistent pattern of conduct is or should be known to, and is formally or tacitly approved by, the City of Detroit and its relevant policymakers.  According to a newspaper article published in the *Detroit Free Press* on June 25, 2008, Detroit Police Department spokesperson James Tate admitted that whenever the police raid an illegal after-hours establishment, ticketing everyone in attendance and towing their cars is "definitely standard operating procedure."

234.  Despite the City of Detroit's actual or constructive knowledge of the clear and persistent pattern of conduct described above, the City has not: (a) trained its officers to enforce City Code § 38-5-1 and M.C.L. § 600.3801 in a lawful manner; (b) supervised its officers to ensure that they do so; or (c) disciplined its officers who enforce City Code § 38-5-1 and M.C.L. § 600.3801 in an unlawful manner.

## COUNT ONE

**42 U.S.C. § 1983**
**Violation of the Fourth Amendment**
**Unlawful Detention**

**-- All CAID Plaintiffs --**

235.  The Fourth Amendment to the United States Constitution prohibits unreasonable searches and seizures, and the Fourth Amendment is incorporated against the States by the Fourteenth Amendment.  Persons violating the Fourth Amendment under color of state law are liable at law and in equity under 42 U.S.C. § 1983.

236.  Defendants Yost, Buglo, and Unnamed Detroit Police Officers, while acting under color of state law, violated the clearly established rights of Plaintiffs Ian Mobley, Paul Kaiser, Angie Wong, James Washington, Nathaniel Price, Stephanie Hollander, Jason Leverette-Saunders, Darlene Hellenberg, and Thomas Mahler to be free from unreasonable seizures by unlawfully detaining them at the CAID on May 31, 2008.

237.  Specifically, Defendants had no arrest warrant authorizing Plaintiffs' detention or arrest and lacked probable cause to believe that Plaintiffs knowingly loitered at a place of illegal occupation or committed any other crime.

238.  Additionally, Defendants lacked reasonable suspicion that Plaintiffs were involved in criminal activity, armed, or dangerous.

239.  Plaintiffs challenge as unreasonable in violation of the Fourth Amendment the fact of their detention as well as its conditions and its duration.

240.  Under 42 U.S.C. § 1983, municipal defendants are "persons" liable for their unconstitutional customs, policies, and practices.

241.   The unconstitutional acts of Defendants Yost, Buglo, and Unnamed Detroit Police Officers were undertaken pursuant to, and proximately caused by, an unconstitutional custom, policy, or practice of Defendant City of Detroit and its Police Department of routinely and unlawfully detaining persons during raids, and initiating frivolous criminal charges against them accusing them of "loitering in a place of illegal occupation," without a warrant and without reasonable suspicion or probable cause to believe the particular person being detained or charged had committed, was committing, or was about to commit that or any other criminal offense. Plaintiffs challenge as unreasonable in violation of the Fourth Amendment the fact that these detentions occur pursuant to custom, policy, or practice, as well as their conditions and duration pursuant to custom, policy, or practice.

242.   The unconstitutional custom, policy, or practice includes, but is not limited to, the City of Detroit's formal or tacit approval of its officers' conduct, deliberately indifferent failure to train its officers, and deliberately indifferent failure to supervise and discipline its officers, all of which proximately caused the constitutional deprivations and harm suffered by Plaintiffs.

## COUNT TWO

**42 U.S.C. § 1983**
**Violation of the Fourth Amendment**
**Excessive Force**

**-- Plaintiffs Kaiser, Wong, N. Price, Washington, and Leverette-Saunders --**

243.   The Fourth Amendment prohibition on unreasonable seizures encompasses the right to be free from excessive force.

244.  One or more Defendant Unnamed Detroit Police Officers, while acting under color of state law, violated the clearly established right of Plaintiff Paul Kaiser to be free from unreasonable seizures by using excessive force against him at the CAID on May 31, 2008.

245.  One or more Defendant Unnamed Detroit Police Officers, while acting under color of state law, violated the clearly established right of Plaintiff Angie Wong to be free from unreasonable seizures by using excessive force against her at the CAID on May 31, 2008.

246.  One or more Defendant Unnamed Detroit Police Officers, while acting under color of state law, violated the clearly established right of Plaintiff Nathaniel Price to be free from unreasonable seizures by using excessive force against him at the CAID on May 31, 2008.

247.  One or more Defendant Unnamed Detroit Police Officers, while acting under color of state law, violated the clearly established right of Plaintiff James Washington to be free from unreasonable seizures by using excessive force against him at the CAID on May 31, 2008.

248.  One or more Defendant Unnamed Detroit Police Officers, while acting under color of state law, violated the clearly established right of Plaintiff Jason Leverette-Saunders to be free from unreasonable seizures by using excessive force against him at the CAID on May 31, 2008.

249.  The unconstitutional acts of the Unnamed Detroit Police Officers were undertaken pursuant to, and proximately caused by, an unconstitutional custom, policy, or practice of Defendant City of Detroit and its Police Department of routinely and unlawfully using excessive force during "vice squad" raids of bars, nightclubs, parties, and similar venues.

250.  The unconstitutional custom, policy, or practice includes, but is not limited to, the City of Detroit's formal or tacit approval of its officers' conduct, deliberately indifferent failure to train its officers, and deliberately indifferent failure to supervise and discipline its officers, all of which proximately caused the constitutional deprivations and harm suffered by Plaintiffs.

## **COUNT THREE**

**42 U.S.C. § 1983**
**Violation of the Fourth Amendment**
**Unreasonable Search of Persons**

**-- All CAID Plaintiffs --**

251.  Defendants Yost, Buglo, and Unnamed Detroit Police Officers, while acting under color of state law, violated the clearly established rights of Plaintiffs Ian Mobley, Paul Kaiser, Angie Wong, James Washington, Nathaniel Price, Stephanie Hollander, Jason Leverette-Saunders, Darlene Hellenberg, and Thomas Mahler to be free from unreasonable searches by unlawfully searching their persons at the CAID on May 31, 2008.

252.  Specifically, Defendants had no warrant authorizing such searches and lacked probable cause to believe that Plaintiffs knowingly loitered at a place of illegal occupation or committed any other crime on May 31, 2008.

253.  Additionally, Defendants lacked reasonable suspicion that Plaintiffs were involved in criminal activity, armed, or dangerous.

254.  Plaintiffs challenge as unreasonable in violation of the Fourth Amendment the fact of the search of their persons as well as its scope and its duration.

255.  The unconstitutional acts of Defendants Yost, Buglo, and Unnamed Detroit Police Officers were also undertaken pursuant to, and proximately caused by, an unconstitutional custom, policy, or practice of Defendant City of Detroit and its Police Department of routinely and unlawfully searching persons during raids without a warrant and without reasonable suspicion or probable cause to believe the particular person being searched was involved in criminal activity, armed, or dangerous.  Plaintiffs challenge as unreasonable in violation of the

Fourth Amendment the fact that these searches occur pursuant to custom, policy, or practice, as well as their scope and duration pursuant to custom, policy, or practice.

256.  The unconstitutional custom, policy, or practice includes, but is not limited to, the City of Detroit's formal or tacit approval of its officers' conduct, deliberately indifferent failure to train its officers, and deliberately indifferent failure to supervise and discipline its officers, all of which proximately caused the constitutional deprivations and harm suffered by Plaintiffs.

**COUNT FOUR**

**42 U.S.C. § 1983**
**Violation of the Fourth Amendment**
**Malicious Prosecution**

**-- All CAID Plaintiffs --**

257.  The Fourth Amendment prohibition on unreasonable seizures encompasses the right to be free from malicious prosecution.

258.  Defendants Yost, Buglo, and Unnamed Detroit Police Officers, while acting under color of state law, violated the clearly established rights of Plaintiffs Ian Mobley, Paul Kaiser, Angie Wong, James Washington, Nathaniel Price, Stephanie Hollander, Jason Leverette-Saunders, Darlene Hellenberg, and Thomas Mahler to be free from unreasonable seizures by unlawfully causing criminal prosecutions to be instituted against them.

259.  Specifically, Defendants caused Plaintiffs to be charged with "loiter[ing] in a place of illegal occupation" in violation of section 38-5-1 of the Detroit City Code.

260.  Defendants lacked probable cause to initiate the criminal proceedings; the criminal proceedings ended in Plaintiffs' favor; and the criminal proceedings were the result of malice by Defendants.

261. The unconstitutional acts of Defendants Yost, Buglo, and Unnamed Detroit Police Officers were also undertaken pursuant to, and proximately caused by, an unconstitutional custom, policy, or practice of Defendant City of Detroit and its Police Department of routinely and unlawfully causing criminal prosecutions to be initiated against persons for "loiter[ing] in a place of illegal occupation" in violation of Detroit City Code § 38-5-1 without probable cause and with malice.

262. The unconstitutional custom, policy, or practice includes, but is not limited to, the City of Detroit's formal or tacit approval of its officers' conduct, deliberately indifferent failure to train its officers, and deliberately indifferent failure to supervise and discipline its officers, all of which proximately caused the constitutional deprivations and harm suffered by Plaintiffs.

## COUNT FIVE

**42 U.S.C. § 1983**
**Violation of the Fourth Amendment**
**Unreasonable Seizure of Property**

**-- All Parent Plaintiffs --**
**and**
**-- Plaintiffs I. Mobley, Wong, N. Price, Leverette-Saunders, Hellenberg, and T. Mahler --**

263. Defendants Yost, Buglo, and Unnamed Detroit Police Officers, while acting under color of state law, violated the clearly established rights of Plaintiffs Ian Mobley, Kimberly Mobley, Angie Wong, Nathaniel Price, Jerome Price, Jason Leverette-Saunders, Wanda Leverette, Darlene Hellenberg, Thomas Mahler, and Laura Mahler to be free from unreasonable seizures by unlawfully seizing and impounding their cars on May 31, 2008.

264. Specifically, Defendants had no warrant authorizing such seizures and lacked reasonable suspicion and probable cause to believe that the cars seized from Plaintiffs were an

abatable nuisance under M.C.L. § 600.3801 or subject to lawful forfeiture or seizure under any other legal authority.

265.  The unconstitutional acts of Defendants Yost, Buglo, and Unnamed Detroit Police Officers were also undertaken pursuant to, and proximately caused by, an unconstitutional custom, policy, or practice of Defendant City of Detroit and its Police Department of routinely and unlawfully seizing the vehicles of everyone who drove to or near a raided location without reasonable suspicion or probable cause to believe the particular vehicle being seized is an abatable nuisance under M.C.L. § 600.3801 or subject to lawful forfeiture or seizure under any other legal authority.

266.  The unconstitutional custom, policy, or practice includes, but is not limited to, the City of Detroit's formal or tacit approval of its officers' conduct, deliberately indifferent failure to train its officers, and deliberately indifferent failure to supervise and discipline its officers, all of which proximately caused the constitutional deprivations and harm suffered by Plaintiffs.

### COUNT SIX

**42 U.S.C. § 1983**
**Violation of the Fourteenth Amendment**
**Denial of Due Process of Law -- Loitering Ordinance**

**-- All CAID Plaintiffs --**

267.  The Fourteenth Amendment to the United States Constitution prohibits the deprivation of life, liberty, or property without due process of law.  Persons violating the Due Process Clause under color of state law are liable at law and in equity under 42 U.S.C. § 1983.

268.  As applied in the circumstances giving rise to this case, Detroit City Code § 38-5-1 ("loiter in a place of illegal occupation" provision) violates the Due Process Clause because it

penalizes a broad range of innocent conduct, fails to provide a person of ordinary intelligence fair notice of what is prohibited, and is so standardless as to authorize or encourage arbitrary and discriminatory enforcement.

269.  Defendants Yost, Buglo, and Unnamed Detroit Police Officers, while acting under color of state law, violated the clearly established due process rights of Plaintiffs Ian Mobley, Paul Kaiser, Angie Wong, James Washington, Nathaniel Price, Stephanie Hollander, Jason Leverette-Saunders, Darlene Hellenberg, and Thomas Mahler by unlawfully enforcing Detroit City Code § 38-5-1 in violation of the Fourteenth Amendment.

270.  The unconstitutional acts of Defendants Yost, Buglo, and Unnamed Detroit Police Officers were also undertaken pursuant to, and proximately caused by, an unconstitutional custom, policy, or practice of Defendant City of Detroit and its Police Department of routinely and unlawfully enforcing and applying Detroit City Code § 38-5-1 in such a way as to violate the Due Process Clause.

271.  The unconstitutional custom, policy, or practice includes, but is not limited to, the City of Detroit's formal or tacit approval of its officers' conduct, deliberately indifferent failure to train its officers, and deliberately indifferent failure to supervise and discipline its officers, all of which proximately caused the constitutional deprivations and harm suffered by Plaintiffs.

complaint continued on next page

## COUNT SEVEN

**42 U.S.C. § 1983**
**Violation of the Fourteenth Amendment**
**Denial of Due Process of Law -- Nuisance Abatement Statute**

**-- All Parent Plaintiffs --**
**and**
**-- Plaintiffs I. Mobley, Wong, N. Price, Leverette-Saunders, Hellenberg, and T. Mahler --**

272.  As applied in the circumstances giving rise to this case, M.C.L. § 600.3801 violates the Due Process Clause because it penalizes a broad range of innocent conduct, fails to provide a person of ordinary intelligence fair notice of what is prohibited, and is so standardless as to authorize or encourage arbitrary and discriminatory enforcement.

273.  Defendants Yost, Buglo, and Unnamed Detroit Police Officers, while acting under color of state law, violated the clearly established due process rights of Plaintiffs Ian Mobley, Kimberly Mobley, Angie Wong, Nathaniel Price, Jerome Price, Jason Leverette-Saunders, Wanda Leverette, Darlene Hellenberg, Thomas Mahler, and Laura Mahler by unlawfully enforcing M.C.L. § 600.3801 against their property in violation of the Fourteenth Amendment.

274.  The unconstitutional acts of Defendants Yost, Buglo, and Unnamed Detroit Police Officers were also undertaken pursuant to, and proximately caused by, an unconstitutional custom, policy, or practice of Defendant City of Detroit and its Police Department of routinely and unlawfully enforcing and applying M.C.L. § 600.3801 in such a way as to violate the Due Process Clause.

275.  The unconstitutional custom, policy, or practice includes, but is not limited to, the City of Detroit's formal or tacit approval of its officers' conduct, deliberately indifferent failure to train its officers, and deliberately indifferent failure to supervise and discipline its officers, all of which proximately caused the constitutional deprivations and harm suffered by Plaintiffs.

44

## DEMAND FOR RELIEF

Plaintiffs request that this Court:

a.  assert jurisdiction over this matter;

b.  declare as follows:

    i.  Defendants' conduct during the CAID raid, as alleged above, violated Plaintiffs' rights under the Fourth and Fourteenth Amendments;

    ii.  the search or seizure of a person on grounds that they "loitered in a place of illegal occupation" in violation of Detroit City Code § 38-5-1 is unlawful absent probable cause such person knows of the illegality; and

    iii.  the seizure of a vehicle under the "nuisance abatement" statute, M.C.L. § 600.3801, is unlawful absent probable cause the vehicle was knowingly used for an unlawful purpose enumerated by that statute;

c.  award compensatory damages to Plaintiffs, in an amount to be proved at trial;

d.  enjoin Defendants from:

    i.  detaining, searching, or ticketing a person for "loitering in a place of illegal occupation" absent probable cause that such person knows of the illegality;

    ii.  seizing a vehicle under the nuisance abatement statute absent probable cause that the vehicle was knowingly used for an unlawful purpose enumerated by that statute; and

    iii.  maintaining a custom, policy, or practice of the unconstitutional conduct alleged in this Complaint.

e.   award Plaintiffs costs and attorneys' fees pursuant to 42 U.S.C. § 1988; and

f.   grant or award such other relief that this Court deems just and proper.

Respectfully submitted,

/s/ Daniel S. Korobkin
Daniel S. Korobkin (P72842)
Michael J. Steinberg (P48085)
Kary L. Moss (P49759)
American Civil Liberties Union
   Fund of Michigan
2966 Woodward Ave.
Detroit, MI 48201
(313) 578-6824
dkorobkin@aclumich.org
msteinberg@aclumich.org


/s/ William H. Goodman (with permission)
William H. Goodman (P14173)
Julie H. Hurwitz (P34720)
Kathryn Bruner James (P71374)
Cooperating Attorneys, American Civil
   Liberties Union Fund of Michigan
Goodman & Hurwitz, P.C.
1394 E. Jefferson Ave.
Detroit, MI 48207
(313) 567-6170
bgoodman@goodmanhurwitz.com
jhurwitz@goodmanhurwitz.com
kjames@goodmanhurwitz.com

Attorneys for Plaintiffs

Dated:  February 18, 2010


## **JURY DEMAND**

Plaintiffs demand a jury on all issues so triable.

Respectfully submitted,

/s/ Daniel S. Korobkin

Daniel S. Korobkin (P72842)
Michael J. Steinberg (P48085)
Kary L. Moss (P49759)
American Civil Liberties Union
   Fund of Michigan
2966 Woodward Ave.
Detroit, MI 48201
(313) 578-6824
dkorobkin@aclumich.org
msteinberg@aclumich.org


/s/ William H. Goodman (with permission)
William H. Goodman (P14173)
Julie H. Hurwitz (P34720)
Kathryn Bruner James (P71374)
Cooperating Attorneys, American Civil
   Liberties Union Fund of Michigan
Goodman & Hurwitz, P.C.
1394 E. Jefferson Ave.
Detroit, MI 48207
(313) 567-6170
bgoodman@goodmanhurwitz.com
jhurwitz@goodmanhurwitz.com
kjames@goodmanhurwitz.com

Attorneys for Plaintiffs

Dated:  February 18, 2010