UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

IAN MOBLEY, ET AL,

      Plaintiffs,

vs                                                          Case No: 10-10675
                                                            Honorable Victoria A. Roberts

CITY OF DETROIT, ET AL,

      Defendants.

_____

**OPINION AND ORDER**

I.    **SUMMARY**

Pending before the Court are three dispositive motions arising from events that occurred on May 31, 2018:

1.    Plaintiffs' motion for partial summary judgment against the City of Detroit ("the City") (Doc. 81).  Plaintiffs say that all of the actions taken by Defendant police officers on May 31, 2008, (arrest, search, seizure of property, excessive force, prosecution and due process violations) were pursuant to unlawful policies and customs of the City and the Detroit Police Department ("DPD").

This motion is **GRANTED IN PART**.  The Court **GRANTS** summary judgment on Plaintiffs' § 1983 unlawful arrest, search, and seizure of property claims.  Trial will proceed on damages on these claims.   It **DENIES** summary judgment with respect to Plaintiffs' malicious prosecution, excessive force and due process claims.

1

2.      The City, Gregory McWhorter "(McWhorter"), Anthony Potts ("Potts"),

Charles Turner ("Turner"), Michael Brown (Brown"), Brandon Cole

("Cole"), Tyrone Gray (Gray"), Sheron Johnson ("Johnson") and Kathy

Singleton's ("Singleton") Motion for Summary Judgment (Doc. 84).

Defendants claim Plaintiffs fail to demonstrate a City policy or custom that

was behind their detention or prosecutions.  They argue there is no

evidence of excessive force against any Plaintiff.  Finally, they argue that

the officers had probable cause to arrest, prosecute and seize vehicles,

and that qualified immunity shields them because their conduct did not

violate clearly established law.

This motion is **DENIED IN PART AND GRANTED IN PART**.  The Court grants

Defendants' motion with respect to the excessive force, malicious prosecution and due

process claims but **DENIES** it in all other aspects.  As already stated, trial will proceed

against all Defendants on the issue of damages for Plaintiffs' unlawful arrest, search,

and seizure of property claims.

3.      Defendant Vicki Yost ("Yost") and Daniel Buglo's ("Buglo") Amended

Motion for Summary Judgment (Doc. 85).  Defendants argue the facts do

not demonstrate that Plaintiffs' constitutional rights were violated, either in

their seizure or in the seizures of vehicles.  They contend also, that even if

the Court finds they made a mistake, their mistake was reasonable and

they are entitled to qualified immunity.

This motion is **DENIED IN PART AND GRANTED IN PART**.  The Court grants

2

Defendants' motion with respect to the excessive force, malicious prosecution and due process claims but **DENIES** it in all other aspects.  Trial will proceed on the issue of damages for Plaintiffs' unlawful arrest, search, and seizure of property claims against these Defendants.

The Court holds that:

1.      Plaintiffs establish several violations of constitutional rights:

      A.      Defendants had no probable cause to arrest them; Defendants were unaware of whether each Plaintiff had engaged in criminal conduct.

      B.      Defendants had no probable cause or reasonable suspicion to search them.

      C.      Defendants had no probable cause to seize vehicles.

2.      The right of Plaintiffs to be secure in their persons and property is clearly established.

3.      Defendants are not entitled to qualified immunity; any mistake they made was not reasonable under the circumstances.

4.      The individual Defendants acted pursuant to a custom or policy of the City to enforce its ordinance, City Code § 38-5-1 ("disorderly conduct ordinance"), even when there is no probable cause to believe that the persons against whom it is being enforced, have knowledge of illegal activity.  In other words, the City had a practice of arresting persons for loitering and searching them, even when there was no probable cause to believe they intended to engage in unlawful conduct.

3

5.     The individual Defendants acted pursuant to a custom or policy of the City
       to enforce M.C.L §600.3801 ("Nuisance Abatement" statute) against cars,
       even when there was no probable cause to believe that the cars were
       knowingly used for an illegal purpose described in the statute.  This
       custom or policy of the City allowed police officers to seize vehicles simply
       because they were driven to a location where unlawful conduct occurred.

II.   **OVERVIEW**

Plaintiffs were patrons at the Contemporary Art Institute of Detroit ("CAID") in the City on the evening of May 31, 2008.  They attended a popular late-night event known as "Funk Night," which occurred the last Friday of each month.  Funk Night occurred after hours, i.e., after 2:00 am, and involved the service of alcohol.  Although CAID could have obtained a special license to serve alcohol after hours, it did not have that license on May 31, 2008;  It did not have a license to serve *any* alcohol, *any* time.

DPD had CAID under surveillance before May 31, 2008.  Yost, then commanding officer of DPD's Vice Unit, received and investigated complaints of unlicensed, after hours liquor sales at CAID.  She and Buglo conducted surveillance outside of CAID on March 29, 2008.  They observed many parked cars and young people entering CAID. They heard loud music, and observed patrons concealing and drinking intoxicants. They smelled marijuana coming from a fenced, outdoor area belonging to CAID.

On April 26, 2008, Yost and Buglo entered CAID as undercover patrons, in response to "blind pig" activity complaints.  A "blind pig" is a regional Prohibition-Era term for a "speakeasy," an establishment that sells and service alcoholic beverages illegally.  *See American Heritage Dictionary of the English Language* 196, 1680 (5th ed,

4

2011); Karen Blumenthal, *Bootleg: Murder, Moonshine, and the Lawless Years of Prohibition* 64, 81, 128 (2011).   Yost and Buglo observed patrons purchase beer; they purchased it themselves.  They went to the outdoor patio and observed patrons drinking and smoking marijuana.  Buglo purchased beer both before and after 2:00 am.  When Yost and Buglo left at 2:20 am, a long line of patrons waited to get into CAID.

On May 24, 2008, Buglo conducted a third investigation, an outdoor surveillance. His observations were consistent with what he and Yost observed on April 26, 2008. They also confirmed that CAID was neither licensed to conduct business in the City nor to sell liquor in the State of Michigan.

Yost and Buglo documented their observations and investigations in reports Buglo used to obtain an Anticipatory Search Warrant for CAID on May 29, 2008.  The Anticipatory Search Warrant gave authority to DPD officers to search the CAID and to seize: (1) firearms; (2) property such as contraband and things associated with illegal drug activity and gambling; (3) alcohol and profits associated with its sale, and (4) computer equipment associated with the operation of the CAID.  It did not authorize any arrests or searches of patrons.

On May 31, 2008 the prior observations of Yost and Buglo were confirmed; they observed alcohol sold and purchased before and after 2:00 am; they smelled marijuana. Shortly after 2:00 am, Yost gave the go-ahead to assembled officers to enter the CAID and execute the warrant.

Plaintiffs Ian Mobley, Paul Kaiser, Angie Wong, James Washington, Nathaniel Price , Stephanie Hollander, Jason Leverette-Saunders and Darlene Hellenberg were among 130 patrons detained, searched and charged with loitering in a place of illegal

5

occupation.  Defendants say authority for these actions was the City's disorderly conduct ordinance.

The criminal charges against Plaintiffs were eventually dismissed.

Also, Kimberly Mobley, Angie Wong, Jerome Price, Wanda Leverette, Darlene Hellenberg and Laura Mahler were among 44 patrons whose cars were seized for forfeiture under the Nuisance Abatement statute.

Plaintiffs Kimberly Mobley, Jerome Price, Wanda Leverette and Laura Mahler were not at the CAID on May 31, 2008, but owned cars that were seized that night under the Nuisance Abatement statute, solely because they were driven by CAID patrons.

The vehicles of Kimberly Mobley, Wanda Leverette, Laura Mahler, Angie Wong and Darlene Hellenberg were returned to them; the Jerome Price vehicle was stolen from the lot to which it had been towed.

**WHAT PLAINTIFFS CLAIM**

Plaintiffs say that those among them who were arrested, were arrested for their mere presence at the CAID and not because DPD officers had probable cause to arrest them.  Indeed, Plaintiffs allege that Plaintiffs Paul Kaiser, Ian Mobley, Angie Wong, James Washington, Stephanie Hollander and Jason Leverette-Saunders were in the fenced patio where no alcohol was served.  They allege that Paul Kaiser and Angie Wong were leaving when the raid occurred and had come there only to pick up a friend. They say Ian Mobley, Paul Kaiser and James Washington had never been to the CAID before May 31, 2008, that Nathaniel Price had just arrived and was still at the front door, and Darlene Hellenberg was in a back room where people danced. They argue that the

6

City's disorderly conduct ordinance required that officers first ascertain whether patrons knew they were in a place of "illegal occupation," and that the DPD had no probable cause to believe that the patrons knew owners of CAID had failed to obtain the proper licenses to serve alcohol.  Plaintiffs contend this lack of probable cause to arrest them violated the Fourth Amendment's prohibition against illegal searches and seizures.

Relatedly, Plaintiffs argue that the DPD officers had no reasonable suspicion that Plaintiffs were armed and dangerous, so there was no basis to search them.  Plaintiffs contend the Anticipatory Search Warrant did not authorize the search and detention of any person.

Plaintiffs do not challenge that the DPD had probable cause to obtain the Anticipatory Search Warrant.  They do challenge what they claim was the unjustified search and arrest of Plaintiffs, merely because they were present at the CAID. They also challenge their criminal prosecution for loitering in a place of illegal occupation. Plaintiffs say this was a "merely present" -- and illegal -- prosecution.

With respect to the seizure of vehicles, those Plaintiffs who had vehicles seized argue that this was an unlawful taking of property because the DPD officers lacked probable cause to believe the vehicles had been used for an unlawful purpose.  They say the vehicles were "merely parked" outside and DPD officers had no evidence that Plaintiffs knew that the owners had done anything wrong, or knew that CAID was not licensed to serve alcohol.

Plaintiffs contend that both the seizure of persons and vehicles was done with the blessing of the City, hence their *Monell* claim.  *Monell v. Dept. Of Social Services,* 436 U.S. 658 (1978).  They say the seizures of persons and cars was done under the

7

authority of long-standing policies and customs of the City and the DPD.

III.    **ORDINANCE AND STATUTE AT ISSUE**

The disorderly conduct ordinance under which Plaintiffs were ticketed on May 31, 2008 was City Code § 38-5-1.  It then read:

> Any person who shall make or assist in making any noise, disturbance, or improper diversion or any rout or riot, by which the peace and good order of the neighborhood is disturbed, or any person who shall consume alcoholic beverages on any street or sidewalk, or who shall engage in any indecent or obscene conduct in any public place, or who shall engage in an illegal occupation, or who shall loiter in a place of illegal occupation, shall be guilty of a misdemeanor.

After suit was filed, the ordinance was amended to prohibit loitering in a place of illegal occupation "with the intent to engage in such illegal occupation":

> Any person who shall make or assist in making any noise, disturbance, or improper diversion or any rout or riot, by which the peace and good order of the neighborhood is disturbed, or any person who shall consume alcoholic beverages on any street or sidewalk, or who shall engage in any indecent or obscene conduct in any public place, or who shall engage in an illegal occupation, or who shall loiter in a place of illegal occupation *with the intent to engage in such illegal occupation*, shall be guilty of a misdemeanor. (emphasis added)

Plaintiffs' vehicles were seized under the authority of Michigan's Nuisance Abatement statute, M.C.L. §600.3801 *et seq*.  When their vehicles were seized, the drivers were given pieces of paper entitled "Nuisance Abatement: Notice of Impoundment of Vehicle."  The notice stated:

> The motor vehicle you were driving or in which you were a passenger was seized pursuant to an arrest or a state misdemeanor or a comparable city ordinance violation involving lewdness, assignation, and/or solicitation for

8

prostitution, or used for the unlawful manufacture, storing,
possessing, transporting, sale, keeping for sale, giving away,
bartering or furnishing of any controlled substance or any
intoxicating liquors...

IV.   **WHAT IS NOT IN DISPUTE**

The City does not dispute important allegations made by Plaintiffs:

1.    Plaintiffs were under arrest on May 31, 2008, and not merely detained;

2.    All patrons during the so-called "blind pig" raids were detained, searched
      and charged with loitering in a place of illegal occupation, and the DPD
      had not first ascertained whether the patrons knew the place was
      unlicensed or operating unlawfully, or whether the patrons intended to
      engage in illegal activity.

3.    Knowledge is an implied element of the misdemeanor offense "loitering in
      a place of illegal occupation."

4.    The seized vehicles were seized only under the authority of the Nuisance
      Abatement statute, and police seized vehicles solely because they were
      used to transport certain Plaintiffs to or near the CAID.

5.    Defendants believed that simply driving vehicles to the location of an
      unlawful sale of alcohol was sufficient to seize a car.

V.    **DEFENSES AND MOTION FOR SUMMARY JUDGMENT**

While the City agrees that knowledge is an implied element of loitering in a place
of illegal occupation, it contends there was probable cause to believe Plaintiffs knew
that the CAID sold alcohol without a liquor license and after 2:00 am, and that the
probable cause justified the detention, arrest, search and prosecution of Plaintiffs and

9

the towing of their vehicles.

The City disputes that this same knowledge component is imported into the Nuisance Abatement statute, or that the statute was unconstitutionally applied to the Plaintiffs. The City also says that the DPD had probable cause to seize and tow the vehicles, because Plaintiffs knew or should have known the CAID operated as a blind pig.

They say Plaintiffs can point to no custom or policy of the City which officers relied upon. Even if an unconstitutional policy existed, Defendants say Plaintiffs cannot point to: (1) a policy maker such as the Mayor, Police Chief or City Council members who implemented such a policy; (2) a policy that was persistent and widespread; or, (3) a policy that was the moving force behind the actions taken by DPD officers on May 31, 2008.

## INDIVIDUAL POLICE OFFICERS

Defendants say there is no *Monell* claim for failure to train, supervise or discipline. They also argue no excessive force was used, there was probable cause for the arrest, search and seizure of Plaintiffs' vehicles and that the officers are shielded by qualified immunity.

VI.   **RULE 56 STANDARD**

The Court will grant summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250-57 (1986). When reviewing cross-motions for summary judgment, the court must

10

assess each motion on its own merits. *Federal Ins. Co. v. Hartford Steam Boiler Insp. and Ins. Co.*, 415 F.3d 487, 493 (6th Cir. 2005)**.** "The standard of review for cross-motions for summary judgment does not differ from the standard applied when a motion is filed by only one party to the litigation." *Lee v. City of Columbus*, 636 F.3d 245, 249 (6th Cir.2011). "[T]he filing of cross-motions for summary judgment does not necessarily mean that an award of summary judgment is appropriate." *Spectrum Health Continuing Care Group v. Anna Marie Bowling Irrevocable Trust*, 410 F.3d 304, 309 (6th Cir.2005). However, summary judgment is particularly appropriate where "the case turns upon an issue of law, such as the construction of a statute." *Salazar v. Brown*, 940 F.Supp. 160, 161 (W.D. Mich. 1996).

VII.   **QUALIFIED IMMUNITY**

Numerous individual officers named as Defendants assert qualified immunity as a defense. This is a list of them and the roles Plaintiffs say they played on the morning of May 31, 2008.

Plaintiffs say Yost unreasonably authorized their constitutional violations. They say Buglo and Turner directly participated in these violations because they were responsible for: (1) processing Plaintiffs, (2) charging them and (3) impounding their cars.

1.   **LIEUTENANT VICKI YOST, SUPERVISOR OF DPD VICE UNIT**

a. Yost authorized the constitutional violations.

b. Yost took full responsibility for the law enforcement action and decision-making at the CAID as the raid commander.

11

c.  Yost initiated the raid.

d.  Yost contacted the manager of the CAID on an earlier date to inform

him that he could sell alcohol legally if he obtained a license.

e.  Yost and Buglo entered the CAID in an undercover capacity on earlier

dates to confirm that alcohol was served unlawfully.

f.  Yost called in the armed raid team to execute the search warrant.

g. Yost decided to impound all the patrons' cars - she says she spoke with

someone at the Wayne County prosecutor before the raid, who confirmed

the statute authorized the seizure of the cars.

2.   **SERGEANT DANIEL BUGLO**

a.  Defendant Buglo was deputy raid commander.

b.  Sergeant Buglo obtained the Anticipatory Search Warrant.

c.  As deputy raid commander, he had supervisory authority over the

officers who issued the citations.

3.   **SERGEANT CHARLES TURNER**

a.  Turner had supervisory responsibility for "processing" Plaintiffs,

charging them with loitering, and impounding their vehicles.

b.  Turner was the officer who issued Wong a criminal citation for loitering

in a place of illegal occupation.

Plaintiffs say the following Defendants are liable because they: (1) were directly

responsible for issuing criminal citations to Plaintiffs, thereby giving rise to Plaintiffs'

claims for malicious prosecution and (2) knowingly worked together to detain and

12

search Plaintiffs without individualized probable cause and towed their cars.

4.      **SERGEANT G. MCWHORTER**

a.  McWhorter charged Plaintiff James Washington with loitering in a place of illegal occupation.

5.      **SERGEANT A. POTTS**

a.  Potts charged Plaintiffs Ian Mobley and Nathaniel Price with loitering in a place of illegal occupation.

6.      **OFFICER M. BROWN**

a.  Brown charged James Washington with loitering in a place of illegal occupation.

7.      **OFFICER B. COLE**

a.  Cole participated in the search and seizure of Plaintiffs and issued the citation that led to the seizure of Laura Mahler's car.

b.  Cole issued a citation to Thomas Mahler for loitering in a place of illegal occupation.

8.      **OFFICER TYRONE GRAY**

a. Gray charged Jason Leverette-Saunders with loitering in a place of illegal occupation.

9.      **OFFICER SHERON JOHNSON**

a.  Johnson charged Darlene Hellenberg and Paul Kaiser with loitering in a place of illegal occupation.

10.     **OFFICER K. SINGLETON**

a.  Singleton charged Stephanie Hollander with loitering in a place of illegal occupation.

Qualified Immunity protects people such as these individual police officers from the burden of litigation and the burden of any liability for a plaintiff's damages, so long as the defendant did not violate clearly established law.  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  For purposes of this litigation the Court assesses whether Plaintiffs allege a constitutional violation and, secondly, whether the alleged violations are of clearly established law.  *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).

A.   **PROBABLE CAUSE TO ARREST UNDER THE CITY ORDINANCE (COUNT ONE)**

The Fourth Amendment protects against unreasonable searches and seizures, and searches and seizures not based on probable cause.  Probable cause is a "reasonable grounds for belief, supported by less than prima facie proof but more then mere suspicion."  *United States v. McLain*, 444 F.3d 556, 562 (6th Cir. 2005) (quoting *United States v. Ferguson*, 8 F.3d 385, 392 (6th  Cir. 1993) (en banc)).  Probable cause is established if there is an objectively reasonable basis for the belief that a crime has been committed.  *Id.* at 563.

Knowledge or intent to violate a law that is not one of strict liability, is implied as a matter of law. *Staples v. United States*, 511 U.S. 600, 607 n. 3 (U.S. 1994); *United States v. Bailey*, 444 U.S. 394, 404, n. 4 (U.S. 1980).

The Michigan Supreme Court has held that "Absent some clear indication that the Legislature intended to dispense with the requirement, we presume that silence suggests the legislature's intent not to eliminate *mens rea.*"  *People v. Tombs*, 472

14

Mich 446, 457; 697 N.W.2d. 494 (2005).  Importantly, the Michigan Supreme Court held that "[i]nferring some type of guilty knowledge or intent is necessary when a statute is silent regarding *mens rea* because without it innocent conduct could be criminalized." *People v. Kowalski*, 489 Mich. 488, 500 n.12;  803 N.W.2d. 200 (Mich 2011).

The City does not disagree, that *mens rea* is an essential element of the City's disorderly conduct ordinance. For the individual Defendants to have arrested Plaintiffs, they had to have reasonable grounds to believe - supported by more than mere suspicion - that Plaintiffs knew the CAID did not have the proper license to serve alcohol.

There is no doubt that the CAID was a place of illegal occupation on May 31, 2008, because it had no license to serve alcohol either before or after 2:00 am.  But, the pertinent inquiry is, what is the proof presented by Defendants that Plaintiffs knew this? There is none. The City and the individual Defendants seek to justify their arrests of Plaintiffs based on Plaintiffs' mere presence at the CAID.  But, mere presence, in and of itself, is never sufficient to establish probable cause that a person knowingly and intentionally was in a place of illegal occupation. *Harris v. Bornhorst*, 513 F.3d 503, 515 (6th Cir. 2008), *cert. denied*, 554 U.S. 903 (2008) ("[I]t is well-established that an individual's mere presence at a crime scene does not constitute probable cause for an arrest.").

The Fourth Amendment requires far more than mere association and presence. "Where the standard is probable cause, a search or seizure of a person must be supported by probable cause particularized with respect to that person." *Ybarra v. Illinois*, 444 U.S. 85, 91 (1979).

Thus, "[e]ven assuming that [police] had probable cause to believe that *some people* present had committed arrestable offenses, [they] nonetheless lacked probable cause for detaining *everyone* who happened to be [at the CAID]."  *Barham v. Ramsey* 434 F.3d 565, 573 (D.C. Cir. 2006) (emphasis in original).  In the end, all the Defendants say is that Plaintiffs "knew or should have known" about the illegality of CAID's operations.

The Court finds that the Plaintiffs presence at CAID on May 31, 2008, without any reasonable grounds for the Defendants to believe Plaintiffs knew the CAID did not have the proper license, was not a crime.

While qualified immunity protects reasonable mistakes by police officers as to what the law requires, *Saucier v. Katz*, 533 U.S. 194, 205 (2001), the proper inquiry is whether the contours of the constitutional right pled by Plaintiffs were "sufficiently clear that a reasonable official would understand that what he [did] violate[d] that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).

While Defendants may be entitled to qualified immunity if they were reasonably mistaken about the facts underlying their incorrect probable cause determinations. *Feather v. Aey*, 319 F.3d 843, 851 (6th Cir. 2001).  There do not appear to be reasonable factual errors at play here.  Defendants are not entitled to qualified immunity on Plaintiffs' arrest claim.

B.   **UNREASONABLE SEARCH (COUNT THREE: YOST, BUGLO, MCWHORTER, POTTS, TURNER, BROWN, COLE, GRAY JOHNSON, AND SINGLETON)**

The Court finds that Plaintiffs allege and substantiate that their clearly established constitutional right to be free from unreasonable searches was violated.

16

The Fourth Amendment protects against unreasonable searches and seizures, and searches and seizures not based on probable cause.  Defendants say they could lawfully search Plaintiffs incident to their arrests.

But, the Court has already ruled there was no probable cause to arrest Plaintiffs. In the alternative, Defendants say there was reasonable suspicion to conduct a *Terry* search.

They make this argument in conclusory fashion, but *Terry* does not authorize generalized searches.  A pat down or frisk is a search within the meaning of the Fourth Amendment.  *Terry v. Ohio*, 392 U.S. 1, 16 (1968).  When executing a search warrant, an officer may pat down or frisk individuals present if there is reasonable suspicion that the specific individual is armed and dangerous.  *Ybarra*, 444 U.S. at 93.  *Terry* authorizes frisks of the outer garments of a person to detect weapons for the limited purpose of officer safety, provided however, the officer can articulate facts which amount to reasonable suspicion to believe the individual is armed and dangerous. *Terry*, 392 U.S. at 27, 30.  Reasonable suspicion is "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant [an] intrusion."  *Id.* at 21.  "[I]n making that assessment it is imperative the facts be judged against an objective standard: would the facts  available to the officer at the moment of the seizure or the search "warrant a man of reasonable caution in the belief" that the action taken was appropriate?"  *Id.* at 21-22.  Reasonable suspicion requires more than good faith on the part of the officer.  *Id.*

Defendants conducted more than pat down searches; they required each Plaintiff to empty pockets once they separated the men and women.  They made no

17

assessment of danger.

Since the law is clear that an officer must have reasonable suspicion to believe an individual is armed and dangerous before performing a frisk, and Defendants did not search Plaintiffs incident a lawful arrest, Defendants searched each person because they were merely present at a blind pig.  Defendants are not entitled to qualified immunity.

C.     **PROBABLE CAUSE TO SEIZE VEHICLES AND THE NUISANCE ABATEMENT STATUTE (COUNT FIVE: YOST AND BUGLO)**

Defendants claim qualified immunity with respect to the Nuisance Abatement statute.  Defendants' primary argument is that the Anticipatory Search Warrant authorized DPD officers to seize evidence or contraband during the search.  Defendants say that since the Plaintiffs admitted they used the vehicles to get to the CAID –- a nuisance -- seizure of the vehicles was authorized as a deterrent measure under the Nuisance Abatement statute.  They cite *Michigan v. Bennis*, 116 S. Ct. 994 (1994) and *Ross v. Duggan*, 402 F.3d 575 (6th Cir. 2004).

Defendants say there was probable cause to seize the vehicles and no clearly established rights of Plaintiffs were violated.

The Plaintiffs ask for summary judgment on the same issue.  They say the warrant did not authorize the seizure of Plaintiffs' cars.  And, they argue that the statute allows for the taking and sale of property declared a nuisance.  They say that under the statute, Plaintiffs' vehicles could not have reasonably been considered to be a nuisance. Hence, the seizures were in violation of the Fourth Amendment.

18

There is no question that Plaintiffs' vehicles were seized within the meaning of the Fourth Amendment. Seizure occurs when there is "some meaningful interference with an individual's possessory interest in that property." *Soldal v. Cook County*, 506 U.S. 56, 61 (1992).

*Michigan ex rel Wayne Co Prosecutor v. Bennis,* 447 Mich. 719, 732; 527 N.W.2d 483 (1994)*, aff'd Bennis v. Mich,* 516 U.S. 42 (1996) (*"Bennis II"*) confirmed that Michigan's Nuisance Abatement statute is a forfeiture statute. Thus, to seize a vehicle as a nuisance, police officers must have probable cause to believe that the vehicle is a nuisance subject to forfeiture under the statute. *Florida v. White*, 526 U.S. 559, (1999); *Soldal, supra*, 506 U.S. at 69.

Defendants rely on *Bennis I* to support their contention that Plaintiffs' vehicles were nuisances subject to forfeiture. This reliance is misplaced; *Bennis* dealt with a part of the Nuisance Abatement statute not at issue here.

*Bennis* was a prostitution case. The Supreme Court decision upholding the forfeiture of a jointly owned automobile turned on the Court's decision that the automobile itself engaged in criminal activity. Mr. Bennis was under surveillance when he flagged down a prostitute; she entered the Bennis car and engaged in an act of fellatio in the car.

The part of the Nuisance Abatement statute under construction in *Bennis I* states:

> Any ... vehicle ... or place used for purpose of lewdness, assignation or prostitution ... or used by, or kept for the use of prostitutes ... is declared a public nuisance... M.C.L. 600.3801.

19

Once Mr. Bennis was convicted of gross indecency, the Wayne County Prosecutor filed a complaint alleging that the Bennis vehicle was a public nuisance subject to abatement pursuant to M.C.L. 600.3801. The trial court held the vehicle was a nuisance and abated the ownership interest of innocent Mrs. Bennis. The Michigan Supreme Court and the United States Supreme Court upheld the ruling.

At issue in this case is a different part of M.C.L. 600.3801:

> Any building ... vehicle ... or place ... used for the unlawful manufacture, transporting, sale, keeping for sale, bartering, or furnishing of any controlled substance ... or intoxicating liquors ... is declared a nuisance. M.C.L. 600.3801.

We know this because the notice Plaintiffs were given when their vehicles were seized said, "the motor vehicle you were driving or in which you were a passenger was seized pursuant to an arrest or a state misdemeanor ... violation ... used for the unlawful manufacture, storing, possessing, transporting, sale, keeping for sale, giving away, bartering or furnishing of any controlled substance or any intoxicating liquors . . . ."

While Plaintiffs do not dispute that the CAID - without proper licenses - was a nuisance under the statute, they argue that to be forfeitable, their vehicles had to be used for one of the enumerated purposes under the statute, and there is no evidence of such use. Defendants say the mere fact that the vehicles were used to get Plaintiffs to the CAID, justifies seizure.

Defendants also rely on *Ross, supra,* in which the Sixth Circuit found that the seizure of plaintiffs' vehicles was lawful even if the illegal conduct occurred outside of the vehicle. *Ross*, 402 F.3d at 586. In *Ross*, the police established a prostitution sting

20

where officers posed as prostitutes; plaintiffs' cars were impounded under the Nuisance Abatement statute in conjunction with their arrests for soliciting prostitutes and other lewdness offenses identified in M.C.L. § 600.3801. *Id.* at 578-79. Two of the plaintiffs challenged the seizure of their cars on grounds that their alleged sex offenses took place outside their cars. *Id.* at 580, 586.  The Sixth Circuit rejected their claims, reasoning that their cars had been "used for the purpose of lewdness, assignation or prostitution" within the meaning of M.C.L. § 600.3801 because "they had transported the criminal perpetrators to the sites of their crimes." *Id.* at 586.

Like *Bennis*, *Ross* deals with a portion of the statute not at issue here. Furthermore, in *Ross*, the Sixth Circuit held that notwithstanding plaintiffs' claims of actual innocence, plaintiffs "conceded that the challenged arrests were supported by probable cause;" thereby giving rise to probable cause to seize plaintiffs' vehicles.  *Id.* at 585-86.

Here, the Court agrees with Plaintiffs: there was no probable cause for police to believe that any Plaintiff engaged in any criminal activity, or to believe that any vehicle had been used for the unlawful manufacture, storing, possessing, transporting, sale, keeping for sale, giving away, bartering or furnishing of any controlled substance ... or intoxicating liquors."   M.C.L. 600.3801.

Courts construe the Michigan Nuisance Statute and similar statutes as authorizing the seizure of vehicles when the vehicles themselves have been the scene of a crime.  (*Bennis*: car used for act of fellatio; *People ex rel Wayne Prosecuting Attorney v. Sill,* 310 Mich 570; 17 N.W.2d. 756 (1945)*(*car used to transport betting slips and proceeds in illegal gambling operation*); VanOster v. Kansas*, 272 U.S. 465, 467

21

(1926)(car used to illegally transport liquor); *Calero-Toledo v. Pearson Yacht*, 416 U.S. 663, 683 (1974)(yacht used to transport marijuana).

In all cases, the vehicles themselves were involved in or used for the criminal activity.  Defendants do not direct the Court to any case where the lawfulness of seizing a vehicle used to transport a person to a place that is the nuisance, without knowledge that it is a nuisance, has been upheld.

In contrast, Plaintiffs direct the Court's attention to *In re Maynard's Petition*, 333 Mich 543, 53 N.W.2d. 370 (1952), where the Court held the nuisance statute did not authorize the forfeiture of a third party's vending machines located inside of a place engaged in the unlawful sale of liquor: "[T]he presence of these machines may add to the convenience of the customers in purchasing candy or cigarettes but certainly did not contribute to the violation of the liquor law, neither were they *implements in the hands of the unlawful operators to further the sale of liquor." Id.* at 546 (emphasis added).

Indeed, if people cannot be guilty of loitering in a place that doesn't have a liquor license if they don't know a liquor license is lacking, they can't have their cars forfeited for getting them to such places if they don't know the places don't have liquor licenses.

If the Nuisance Abatement statute were given the broad interpretation sought by Defendants, there is no end to the forfeitures that could occur in the City: numerous patrons to restaurants, bars, concerts, and sporting events could have their cars forfeited simply for purchasing tickets, or buying drinks or dinner at establishments that did not secure proper licenses.

It is an untenuous result that cannot be sanctioned.

The Court holds that the Nuisance Abatement statute did not authorize the

22

seizure of vehicles under the circumstances that existed at the CAID on May 31, 2008.

Defendant officers did not have probable cause to seize vehicles.  Plaintiffs establish

the violation of their clearly established rights to be free from unlawful seizures in

violation of the Fourth Amendment.

The Court rejects Defendants argument that Plaintiffs' rights were not clearly

established at the time of the seizure because they reasonably relied on a Prosecutor

before seizing Plaintiffs' cars, and Defendants are not entitled to qualified immunity.

VIII.   **PLAINTIFFS' MONELL CLAIMS (COUNTS ONE THROUGH SEVEN: CITY OF
        DETROIT)**

In all counts of the First Amended Complaint, Plaintiffs allege that policies or

practices of the City led to the constitutional deprivations they allege.

The Court has already ruled that Defendants arrested, searched and seized

vehicles without probable cause.  The Plaintiffs seek to hold the City liable for these

constitutional violations under *Monell v. Dept. Of Social Services,* 436 U.S. 658 (1978).

A municipality is liable under §1983 if the acts that violated a person's rights were

undertaken pursuant to its policies and customs.  *Id.* at 690-94.

The City is liable because it has a widespread practice, permanent and well

settled, that constitutes a custom of: (1) detaining, searching, and prosecuting large

groups of persons for "loitering in a place of illegal occupation" based on their *mere*

*presence* at a blind pig, without probable cause; and (2) impounding all the cars that are

driven to such places, based solely on the drivers' mere presence there. *See Cash v.*

*Hamilton County Dep't of Adult Probation*, 388 F.3d 539, 543 (6th Cir. 2004) (quoting

*Monell*, 436 U.S. at 691)(A city may be liable for "a widespread practice that, although

23

not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law.")).

The City admitted that its "standard operating procedure when raiding an establishment that was selling alcohol without a license and/or selling alcohol after 2 a.m. was to ticket *all persons in attendance* for loitering in a place of illegal occupation and to seize their vehicles under the Nuisance Abatement statute." This "standard operating procedure" admission is sufficient to establish municipal liability. *Hunter v. City of Sacramento*, 652 F.3d 1225, 1233 (9th Cir. 2011). The admission was also consistent with the testimony of several police officers who had participated in numerous raids of suspected "blind pigs" over many years.

The City's suggestion that its custom was not "widespread" because the vice unit has only six to eight officers is not persuasive.  Although blind pig raids were organized by the vice squad, the raids were carried out by fifty or more officers assigned to multiple units and divisions of the DPD.  Narcotics crews rotated through the vice squad every 28 days.

Sergeant Potts was not a member of the vice unit, but he participated in blind pig raids while assigned to the tactical mobile unit, the special response team, the Eastern Precinct support unit, and the Thirteenth Precinct; and, he was aware that the disorderly conduct ordinance and Nuisance Abatement statute were enforced against everyone in a blind pig location based on their mere presence.

Likewise, Officer Cole was not a member of the vice unit, but he participated in hundreds of blind pig raids.  He, too, participated in detaining, searching, and prosecuting all the patrons, and seizing their cars for forfeiture, merely because they

24

were present at the raid location.

The City argues that it is not liable because "Yost took full responsibility for the law enforcement action and decision-making at the CAID as the raid commander."  This argument is unavailing.  Yost states that she based her call to arrest, search and seize Plaintiffs' vehicles upon her training and actions during previous blind pig raids with DPD.  The City cannot avoid liability by training an officer to act unconstitutionally and then pointing the finger at the officer when she acts as trained.

The City argues it is not subject to liability because "Plaintiff [sic] cannot show that a policy maker such as the City of Detroit Police Chief, Mayor, or City Council members, implemented the policy or custom . . . ."  But, Plaintiffs are not required to identify a policymaker such as the mayor or police chief who personally approved a policy or displayed "deliberate indifference" to Plaintiffs' rights.  *Monell*, 436 U.S. at 690-91 (1978) (An official legislative or executive act is not required to establish liability; "local governments . . . may be sued for constitutional deprivations visited pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decisionmaking channels.").

Although evidence of a policymaker's specific decision or deliberate indifference are potential avenues to establish municipal liability, they are not necessary if a plaintiff can point to testimony from which a jury can reasonably infer an unconstitutional municipal custom and practice. *See, e.g.*, *Thompson v. City of Los Angeles*, 885 F.2d 1439, 1444 (9th Cir. 1989) ("If such a showing is made, . . . a local government may be liable for its custom irrespective of whether official policymakers had actual knowledge of the practice at issue."); *see also Cash*, 388 F.3d at 543-44 (reversing summary

25

judgment for city and county based on evidence of long-standing police custom of destroying personal property belonging to homeless persons).

Discovery yielded evidence that sufficiently establishes the City's policy under *Monell*. Sergeant Buglo, deputy raid commander, testified that it was "standard procedure," "general practice," and the "custom and usage of the Detroit Police Department." He further testified that "It's been done that way long before I got to [the vice unit]. That's just how it was done. . . . It's just part of the raid procedure . . . ." He says "this was routine practice and policy of the vice enforcement unit of the Detroit Police Department."

Sergeant Turner was involved in about 100 blind pig raids over approximately fifteen years as an officer and supervisor. He testified that "normally anyone inside the location is going to be ticketed," and agreed that this "decision has been made even before you go in" for the raid, and said "we're ticketing the person because he's in the location and there's illegal activity inside the location, whether he knew it or not." He further says that "Normally, . . . if they drove a vehicle, it's going to be impounded."

Sergeant Potts participated in multiple blind pig raids. He said at deposition that "it's the standard operating procedure to detain *all* of the patrons, to pat them down, to remove the contents of their pockets, and to ultimately ticket them." He further agreed that "it was the custom of the police department that when raiding an establishment that was selling alcohol without a license or selling after 2:00 a.m., to charge *all persons in the building* with loitering in a place of illegal occupation and seiz[e] their vehicles under the Nuisance Abatement statute."

Officer Cole took part in hundreds of blind pig raids, and testified that "it was the

26

standard operating procedure of the City of Detroit Police Department, when raiding a blind pig, to ticket everyone there for loitering in a place of illegal occupation and to confiscate the cars that they drove there," regardless of whether they knew they were in a blind pig.

Finally, Officer Gray agreed that "it was the standard operating procedure of the police department and the City that when raiding an establishment that was selling alcohol without a license or selling alcohol after two a.m., to charge all persons in attendance either as an engager or for loitering in a place of illegal occupation and to seize their vehicles under the Nuisance Abatement statute. . . . . And of the ten or so blind pig raids that [he has] participated in, [they have] generally followed this same procedure."

This deposition testimony, coupled with the City's admission, is sufficient to establish a policy or custom.

To impose liability, Plaintiffs must not only identify a policy, it must also establish that the policy or custom is the moving force behind the deprivation. *City of Canton v. Harria*, 489 U.S. 378 (1989); *Searcy v. City of Dayton*, 38 F.3d 282 (6th Cir. 1994). "[T]his is a causation inquiry, requiring the plaintiff to show that it was the defendant's custom or policy that led to the complained of injury." *Powers v. Hamilton County Public Defender Comm'n*, 501 F.3d 592, 608 (6th Cir. 2007); *see, e.g.*, *Garner v. Memphis Police Dep't*, 8 F.3d 358, 364-65 (6th Cir. 1993) (concluding that police department's unconstitutional policy authorizing deadly force against nondangerous fleeing felons caused the death of plaintiff's son).

There is no question that the policies and customs led directly to the arrests,

27

searches and forfeitures complained of by Plaintiffs, in violation of the Fourth
Amendment.

IX.     **EXCESSIVE FORCE (COUNT TWO: ALL DEFENDANTS)**

Count Two of Plaintiffs' First Amended Complaint is an excessive force one on
behalf of : Paul Kaiser, Angie Wong, Nathaniel Price, James Washington, Jason
Leverette-Saunders.  It is against "unnamed officers."

Defendants seek summary judgment, arguing that "Plaintiffs cannot produce any
City of Detroit policy or custom which authorizes or encourages excessive force or
detention and prosecution without reasonable suspicion or probable cause." (Doc. 84,
pp 10-12 (or 20-21).  They deny that any excessive force was used, and contend that
Plaintiffs have not named Defendants McWhorter, Cole, Brown, Potts, Singleton,
Turner, Johnson or Gray as officers who used excessive force.  (Doc. 84.... p. 13/23)

Plaintiffs responded that Defendants motion is premature since Defendants had
not fully complied with Plaintiffs' discovery requests.

Plaintiffs submit an affidavit as part of their response to Defendants' motion,
stating that they have outstanding discovery on their excessive force claim, and that so
long as Defendants fail to comply, summary judgment would be improper.

Discovery disputes have now been resolved, and Plaintiffs continue to be unable
to identify the specific officers who allegedly engaged in excessive force.

For those reasons, the individual Defendants are entitled to summary judgment
on Plaintiffs' excessive force claim.

Also, the Court declines to extend *Monell* liability against the City on Plaintiffs'
excessive force claim.

28

The Complaint alleges that the City's:

> unconstitutional custom, policy, or practice includes, but is not
> limited to, the City of Detroit's formal or tacit approval of its
> officers' conduct, deliberately indifferent failure to train its
> officers, and deliberately indifferent failure to supervise and
> discipline its officers, all of which proximately caused the
> constitutional deprivations and harm suffered by Plaintiffs

Plaintiffs must show that "deliberate and discernible municipal policies or customs . . . were the moving force behind the constitutional injury." *Beddingfield v. City of Pulaski*, 861 F.2d 968, 971 (6th Cir. 1988). Plaintiffs have identified no policy to impose such liability. The City is entitled to summary judgment. *See Russo v. Massullo*, No. 90-3240, 1991 U.S. App. LEXIS 3861, 1991 WL 27420 (6th Cir. Mar. 5, 1991) (granting summary judgment in favor of Beaver Township because Plaintiffs failed to articulate what they perceive to be the "deliberate and discernable [sic]" policy or establish the existence of such policy).

X.  **MALICIOUS PROSECUTION: COUNT FOUR: YOST, BUGLO, MCWHORTER, POTTS, TURNER, BROWN, COLE, GRAY, JOHNSON AND SINGLETON**

Plaintiffs allege the Defendants lacked probable cause to initiate criminal proceedings against them, and the proceedings ended in their favor.

To prevail on this claim, a plaintiff must demonstrate that (1) the defendant participated in the decision to prosecute the plaintiff, (2) probable cause did not support the institution of legal process, (3) the plaintiff suffered a Fourth Amendment deprivation of liberty in addition to the initial seizure as a result of the institution of proceedings, and (4) the legal proceedings resulted in the plaintiff's favor. *Sykes v. Anderson*, 625 F.3d 294, 308-09 (6th Cir. 2010). "[A] plaintiff must show, at a minimum, that there was no probable cause to justify [his] arrest and prosecution." *Barnes v. Wright*, 449 F.3d 709,

716 (6th Cir. 2006)(citations omitted); see also *Sykes*, 625 F.3d at 310-11 (same).

Plaintiffs' claim for malicious prosecution fails because the charges against them were voluntarily dismissed. *Cheolas v. City of Harper Woods*, 2012 U.S. App. LEXIS 802, 2012 WL 89173 (6th Cir. Jan. 10, 2012) (finding no viable claim for malicious prosecution because the charges were voluntarily dismissed).

## XI.    DENIAL OF DUE PROCESS– DISORDERLY CONDUCT ORDINANCE: COUNT SIX: ALL DEFENDANTS

In Count Six, Plaintiffs challenge the constitutionality of the disorderly conduct ordinance on due process grounds, "but only in the event the court concludes that the ordinance must be construed as a strict liability offense."

The Court has already concluded that the disorderly conduct ordinance has a *mens rea* requirement. Summary judgment is granted to Defendants on this claim.

## XI.    DENIAL OF DUE PROCESS- MICHIGAN'S NUISANCE ABATEMENT STATUTE: COUNT SEVEN: ALL DEFENDANTS

One page of Plaintiffs' thirty-three page brief in support of their motion for summary judgment discusses an "as applied" constitutional challenge to Defendants' application of the Nuisance Abatement statute. They say the statute violates their right to due process as applied because it is unconstitutionally vague; they say it does not put ordinary persons on notice of what property can be forfeited as a result of what wrongdoing if the statute does not have a knowledge requirement.

Plaintiffs fail to adequately develop this argument and the issue is waived. *See United States v. Robinson*, 390 F.3d 853, 886 (6th Cir. 2004)("We have cautioned that

30

issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived, and that it is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put the flesh on the bones.) (citations and internal quotations omitted).

**CONCLUSION**

The Court **GRANTS** Plaintiffs' motion for summary judgment against the City on:

1.      Count One: Unlawful Detention;

2.      Count Three: Unreasonable Search of Persons; and

3.      Count Five: Unreasonable Seizure of Property.

Trial will **PROCEED** against the City on damages in connection with these three Counts.

In all other respects, Plaintiff's motion is **DENIED**.

The Court **GRANTS** Defendants' motion for summary judgment and

**DISMISSES**:

1.      Count Two: Excessive Force;

2.      Count Four: Malicious Prosecution;

3.      Count Six: Due Process - Disorderly Conduct Ordinance; and

4.      Count Seven: Due Process - Nuisance Abatement statute.

In all other respects the motion is **DENIED**.  Trial will **PROCEED** against the individual officers on the issue of damages in connection with:

1.      Count One: Unlawful Detention;

2.      Count Three: Unreasonable Search of Persons; and

    3.      Count Five: Unreasonable Seizure of Property.

**IT IS ORDERED.**

S/Victoria A. Roberts
Victoria A. Roberts
United States District Judge

Dated:  December 4, 2012

The undersigned certifies that a copy of this document was served on the attorneys of record by electronic means or U.S. Mail on December 4, 2012.

S/Linda Vertriest
Deputy Clerk